1 COLETTE VOGELE (SBN No. 192865)
  Email: colette@vogelelaw.com
2 BENJAMIN COSTA (SBN No. 245953)
  Email: ben@vogelelaw.com
3 **VOGELE & ASSOCIATES**
  12 Geary Street, Suite 701
4 San Francisco, CA 94108
  Tel: (415) 751-5737
5 Fax: (415) 358-4975

6 Attorneys for Plaintiff and Counter-defendant
  VIOLET BLUE

7

8    UNITED STATES DISTRICT COURT FOR THE

9     NORTHERN DISTRICT OF CALIFORNIA

10      SAN FRANCISCO DIVISION

11

12 VIOLET BLUE, an Individual,   Case No. C 07-5370 SI

13   Plaintiff and Counter-defendant,  **PLAINTIFF VIOLET BLUE'S**
             **NOTICE OF MOTION AND MOTION**
14   v.          **FOR PRELIMINARY INJUNCTION**

15 ADA MAE JOHNSON a/k/a ADA  The Honorable Susan Illston
  WOFFINDEN, an individual d/b/a  Courtroom 10, 19th Floor
16 VIOLET BLUE a/k/a VIOLET a/k/a 450 Golden Gate Avenue
  VIOLET LUST; ASSASSIN PICTURES San Francisco, CA 94102
17 INC., a California Corporation;
  ASSASSINCASH.COM; BILL T. FOX, Hearing Date: May 9, 2008
18 an individual, a/k/a BILL FOX; FIVE Hearing Time: 9:00 a.m.
  STAR VIDEO L.C., an Arizona Limited
19 Liability Company a/k/a Five Star Video
  Distributors LLC d/b/a Five Star
20 Fulfillment; and DOES 1-10,

21   Defendants and Counter-claimants.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

**I.** INTRODUCTION. .................................................................................................................. 1

**II.** RELEVANT FACTS AND PROCEDURAL HISTORY ...................................................... 2

    **A.** STATEMENT OF FACTS. ........................................................................................ 2

        1. Plaintiff Blue's Career As A Sex-Positive Writer, Blogger And Educator. ................................................................................................. 2

        2. Defendant Woffinden's Unauthorized Use Of Plaintiff's Name, Trademark And Persona. ...................................................................... 3

        3. Defendants Woffinden, Assassin Pictures Inc., Assassincash.com, Bill T. Fox, Five Star Video L.C., And Does 1-10 Unauthorized Distribution And Complicity In Infringement. ........................................ 7

    **B.** PROCEDURAL HISTORY ....................................................................................... 8

**III.** ARGUMENT. ........................................................................................................................ 9

    **A.** LEGAL STANDARD FOR PRELIMINARY INJUNCTION. ................................. 9

    **B.** BLUE HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF HER TRADEMARK INFRINGEMENT, TRADEMARK DILUTION, UNFAIR COMPETITION, AND RIGHT OF PUBLICITY CLAIMS. ................................................................................................... 10

        1. Trademark Infringement And Unfair Competition. ................................ 10

            a. Blue Has Protectable Rights In The VIOLET BLUE Mark. ......... 10

            b. A Likelihood Of Confusion Exists Between The Marks. .............. 11

        2. Trademark Dilution ................................................................................ 18

        3. Blue Is Likely To Succeed On The Merits Of Her Claim That Woffinden's Unauthorized Use Of Plaintiff Blue's Name and Likeness Violates Cal. Civ. Code § 3344. ............................................... 21

    **C.** Blue Will Suffer Irreparable Harm If An Injunction Is Not Issued. ...................... 22

    **D.** THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF AND THE PUBLIC INTEREST IS SERVED BY A PRELIMINARY INJUNCTION. ........ 24

**IV.** CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

<u>**CASES**</u>

A&M Records, Inc. v. Napster, Inc.
    239 F.3d 1004 (9th Cir. 2001) ................................................................... 9

Abercrombie & Fitch Co. v. Hunting World, Inc.
    537 F.2d 4 (2d Cir. 1976) ......................................................................... 12

Am. Honda Motor Co. v. Pro-Line Protoform
    325 F. Supp. 2d 1081 (9th Cir. 2004) ...................................................... 20

AMF, Inc. v. Sleekcraft Boats
    599 F.2d 341 (9th Cir 1979) ............................................................. passim

Apple Computer, Inc.
    725 F.2d 521 (9th Cir. 1984) ................................................................... 23

Applied Information Sciences Corp. v. eBAY, Inc.
    511 F.3d 966 (9th Cir. 2007) ................................................... 10, 11, 18

Autozone, Inc. v. Strick
    466 F. Supp. 2d 1034 (E.D. Ill. 2006) ...................................................... 20

Brookfield Commc'ns v. West Coast Entertainment Corp.
    174 F.3d 1036 (9th Cir. 2005) ........................................................ 11, 15

Century 21 Real Estate Corp. v. Sandlin
    846 F.2d 1175 (9th Cir. 1988) ................................................................... 9

Cleary v. News Corp.
    30 F.3d 1255 (9th Cir. 1994) ................................................................... 10

E. & J. Gallo Winery v. Gallo Cattle Co.
    967 F.2d 1280 (9th Cir. 1992) ................................................................. 12

Fleischmann Distilling Corp. v. Maier Brewing Co.
    314 F.2d 149 (9th Cir. 1963) ................................................................... 16

Friend v. H. A. Friend & Co.
    416 F.2d 526 (CA 9 1969) ....................................................................... 16

GoTo.com, Inc. v. Walt Disney Co.
    202 F.3d 1199 (9th Cir. 2000) ................................................................... 9

Grocery Outlet Inc. v. Albertson's Inc.
    497 F.3d 949 (9th Cir. 2007) ..................................................................... 9

HMH Publishing Co. v. Lambert
    482 F.2d 595 (CA 1973) ........................................................................... 16

Hormel Foods Corp. v. Jim Henson Prods., Inc.
    73 F.3d 497 (2d. Cir. 1996) ..................................................................... 21

Int'l Kennel Club of Chicago v. Mighty Star, Inc.
    846 F.2d 1079 (7th Cir. 1988) ........................................................ 9

Interstellar Starship Services, Ltd. v. Epix Inc.
    184 F.3d 1107 (9th Cir. 1999) ........................................................ 18

Inwood Laboratories, Inc. v. Ives Laboratories, Inc.
    456 U.S. 844 (1982).......................................................................... 11

Jada Toys, Inc. v. Mattel, Inc.
    __ F.3d. __, 85 U.S.P.Q.2D (BNA) 1895, 2008 U.S. App. LEXIS 3627 (9th
    Cir. Feb. 21, 2008) ............................................................................ 11

Kendall-Jackson Winery v. E. & J. Gallo Winery
    150 F.3d 1042 (9th Cir. 1998) ........................................................ 10

L.D.Kichler Co. v. Davoil Inc.
    192 F.3d 1349 (Fed.Cir. 1999)........................................................ 13

L.E. Waterman Co. v. Modern Pen Co.
    235 U.S. 88 (1914)............................................................................ 22

Lane Kapital Mgmt., Inc. v. Lane Capital Mgmt., Inc.
    192 F.3d 337 (2d Cir. 1999)............................................................. 12

Los Angeles Memorial Coliseum Com. v. National Football League
    634 F.2d 1197 (9th Cir. 1980) .................................................... 9, 24

Microsoft Corp. v. Evans
    2007 U.S. Dist. LEXIS 77088 (D. Cal. 2007) .......................... 10

Miss Universe, Inc. v. Flesher
    605 F.2d 1130 (9th Cir. 1979) ........................................................ 9

Moseley v. V. Secret Catalogue, Inc.
    537 U.S. 418 (2003)........................................................................ 20

New W. Corp. v. NYM Co.
    595 F.2d 1194 (9th Cir. 1979) ........................................................ 10

Nike, Inc. v. Nikepal Intern., Inc.
    2007 WL 2782030 ............................................................................ 13

Nissan Motor Co. v. Nissan Computer Corp.
    2007 U.S. Dist. LEXIS 90487 (D. Cal. 2007) .......................... 20

Panavision Int'l, L.P. v. Toeppen
    141 F.3d 1316 (1998)........................................................................ 20

Perfumebay.com Inc. v. eBay Inc.
    506 F.3d 1165 (9th Cir. 2007) ........................................................ 18

Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.
    486 F. Supp. 414 (S.D.N.Y. 1980)................................................ 23

Plough, Inc. v. Kreis Laboratories
    314 F.2d 635 (9th Cir. 1963) ........................................................................ 14

Qualitex Co. v. Jacobson Prods. Co.
    514 U.S. 159 (1995) ...................................................................................... 25

Quiksilver, Inc. v. Kymsta Corp.
    466 F.3d 749 (9th Cir. 2006) ........................................................................ 12

Ringling Bros.-Barnum & Bailey, Combined Shows, Inc. v. B.E. Windows, Corp.
    937 F. Supp. 204 (S.D.N.Y. 1996)............................................................ 20, 21

Sardi's Rest. Corp. v. Sardie
    755 F.2d 719 (9th Cir. 1985) ...................................................................... 9, 23

Sierra Online, Inc. v. Phoenix Software, Inc.
    739 F.2d 1415, 1423 (9th Cir. 1984) ............................................................ 9

Two Pesos v. Taco Cabana
    505 U.S. 763 (1992) ...................................................................................... 12

Wal-Mart Stores, Inc. v. Samara Bros., Inc.
    529 U.S. 205 (2000) ...................................................................................... 11

Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.
    419 F.3d 925 (9th Cir. 2005) ........................................................................ 11

**STATUTES**

15 U.S.C. § 1052(f) ............................................................................................ 12

15 U.S.C. § 1057(b) ............................................................................................ 11

15 U.S.C. § 1116(a) ............................................................................................. 9

15 U.S.C. § 1125(c) ............................................................................................ 18

15 U.S.C. § 1125(c)(2)(A) .................................................................................. 19

15 U.S.C. §1125 ................................................................................................. 10

15 U.S.C.S. § 1125(c)(2)(C) ............................................................................... 21

18 U.S.C. § 2257 .................................................................................................. 8

Cal. Bus. & Prof. Code § 14340 .......................................................................... 9

Cal. Bus. & Prof. Code § 17200 .......................................................................... 9

Cal. Bus. & Prof. Code §§ 14330 ........................................................................ 9

Cal. Civ. Code § 3344(a) ............................................................................... 21, 22

Cal. Civ. Code. § 3344 .............................................................................. 1, 9, 21

Cal. Code Civ. Proc § 425.16 ................................................................. 8, 14

Fed. R. Civ. P. 12(b)(6) .............................................................................. 8

Fed. R. Civ. P. 26(a)(1) .............................................................................. 5

## **OTHER AUTHORITIES**

McCarthy on Trademarks and Unfair Competition §§ 27:14 (4th ed. Supp. 2006) .................... 10

McCarthy on Trademarks and Unfair Competition §13:2 (4th ed. Supp. 2006) ........................ 12

McCarthy on Trademarks and Unfair Competition §24:6 (4th ed. Supp. 2006) ........................ 15

McCarthy on Trademarks and Unfair Competition §27:18 (4th ed. Supp. 2006) ...................... 10

McCarthy on Trademarks and Unfair Competition §30:18 (4th ed. Supp. 2006) ...................... 23

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on May 9, 2008, at 9:00 a.m., or as soon thereafter as the

3    matter may be heard by the above-entitled Court, located at 450 Golden Gate Avenue, San

4    Francisco, California, in Courtroom 10 (19th Floor) of The Honorable Susan Illston, Plaintiff

5    Violet Blue ("Blue") will and hereby moves the Court for a preliminary injunction enjoining

6    Defendant and Counterclaim Plaintiff Ada Woffinden ("Woffinden"); Assassin Pictures Inc., a

7    California corporation; Assassincash.com; Bill T. Fox, an individual, a/k/a Bill Fox; Five Star

8    Video L.C., an Arizona limited liability company a/k/a Five Star Video Distributors LLC d/b/a

9    Five Star Fulfillment; and Does 1-10 (collectively "Defendants"), and their officers, directors,

10   agents, servants, employees, members attorneys, distributors and all other persons, firms or

11   corporations, acting in concert and participation with them, their successors and assigns from: (a)

12   using names, trademarks, and Internet domains confusingly similar to, or identical to, Plaintiff's

13   trademark VIOLET BLUE (including the name "Violetta Blue"); (b) infringing any of Plaintiff's

14   trademark rights; (c) identifying themselves as Violet Blue; using the phrase "Violet Blue" in

15   association with any goods or service; and  attempting to trade upon Plaintiff's goodwill by

16   capitalizing on the Violet Blue name through inclusion of "Violet Blue" history, or by referencing

17   her former appearances as "Violet Blue"; and from such other relief as identified in the

18   concurrently-filed [Proposed] Order Granting Plaintiff Violet Blue's Notice Of Motion And

19   Motion For Preliminary Injunction.

20   This motion is based upon the First Amended Complaint for trademark infringement,

21   trademark dilution, violation of Blue's right to publicity under Cal. Civil Code §3344, and unfair

22   competition, this Notice of Motion and Motion, the accompanying Memorandum of Points and

23   Authorities, the Declarations of Benjamin A. Costa in support of this Motion, the pleadings and

24   papers on file, and any arguments of counsel permitted at the hearing of this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION.

27   Plaintiff and Counterclaim Defendant Violet Blue ("Blue") is a well-known and respected

sex-positive[1] educator, blogger, journalist, reporter, accomplished writer, and speaker. Defendant and Counterclaim Plaintiff Ada Mae Woffinden ("Woffinden") is a pornographic actress who has chosen to use Blue's personal name and likeness, as well as Blue's trademark, VIOLET BLUE, as her "stage name" for her pornographic productions, appearances, and work in the adult film industry. This action is a result of serious and continuing confusion caused by Woffinden's insistence in trading off of the goodwill of Blue's trademark, as well as her assuming Blue's personal name and mimicking Blue's likeness and persona. Due to the ongoing confusion, serious harm, and especially in light of recent events, a preliminary injunction is necessary in this case to prevent continued irreparable harm from being suffered by Plaintiff Blue.

## II.   RELEVANT FACTS AND PROCEDURAL HISTORY

**A.    STATEMENT OF FACTS.**

1.      Plaintiff Blue's Career As A Sex-Positive Writer, Blogger And Educator.

Since at least as early as 1999, Violet Blue[2] has been developing her reputation as a writer, lecturer, prolific blogger, podcaster, editor, newspaper columnist, and reporter among other forms of media and education. Blue has become widely recognized as a premier sexual health commentator in California, throughout the country, and throughout the world. [First Amended Complaint ("FAC") at 4:20-27.] She is the author of the column "Open Source Sex," which appears weekly at SFGate.com, which is the website of the *San Francisco Chronicle* newspaper, a well-respected and long-running daily newspaper having a significant regional, national, and international distribution. [FAC at 5:21-25.] Blue's podcast, which boasts an audience of approximately 3.2 million listeners, has been featured in *The Wall Street Journal*. [Declaration of Benjamin A. Costa In Support Of Plaintiff Violet Blue's Notice Of Motion And Motion For Preliminary Injunction ("Costa Decl."), Exh. A (*Wall Street Journal* article, "Now Playing on Apple's iTunes: Adult-Oriented Podcasts," 7/22/05, available at http://online.wsj.com/public/article/SB112199964473193071-wHD0jEWmn1XrxuhE5Hg GCs4siD0_20060721.html?mod=tff_main_tff_top).] Blue is a reporter at Metblogs SF

---

[1] "Sex-positive" generally deals with promoting and providing access to frank and truthful information regarding safer sex guidelines, sexual health and sexual safety, including emotional sexual safety.
[2] Violet Blue is Plaintiff Blue's personal name and has never been changed.

1  (http://sf.metblogs.com/), Geek Entertainment TV (http://www.geekentertainment.tv/), Gawker

2  Media's Fleshbot (http://fleshbot.com/), and is frequently quoted or discussed by mass media

3  around the world.

4       Blue has authored no less than seventeen books on the topic of human sexuality and safer-

5  sex practices, and her books are offered in four languages with more translations forthcoming.

6  [FAC at 5:26–6:3.] She publishes many of her writings online through an internet website entitled

7  "Violet Blue®: Open Source Sex" (located at http://www.tinynibbles.com/), which focuses on

8  human sexuality and safer-sex practices. Her website includes an internet diary -- also known as a

9  weblog or "blog" -- and regularly attracts over 4.3 million visitors each year. [FAC at 5:3-7.] She

10  has written columns for magazines with significant international distribution such as *Forbes* and

11  *O: the Oprah Magazine*. [FAC at 4:25-52; Costa Decl., Exhs. B (*Forbes*, "San Fran's Sexy Solo

12  Scene," 8/21/07, available at http://www.forbes.com/lifestyle/2007/08/21/san-francisco-dating-

13  forbeslife-singles07-cx_vb_0821sanfran.html), C (*O: the Oprah Magazine*, "Eyes Wide Open,"

14  July 2007).] A routine lecturer at the UC Berkeley School of Law, the University of California at

15  San Francisco, Google, Inc., and at numerous conventions, Blue's passion and hard work have

16  won her high esteem and reputation in many industries including technology, media, adult

17  entertainment, health and sexuality, and education. [FAC at 5:8-11.] For her entire career, her

18  writings, publications, programs, speaking engagements, and educational initiatives have all been

19  associated exclusively with her name and trademark, VIOLET BLUE. [FAC at 4:19-22; 6:7-11.]

20        2.        Defendant Woffinden's Unauthorized Use Of Plaintiff's Name, Trademark And
21                  Persona.

22       Woffinden is an American pornographic actress who has appeared in hundreds of

23  pornographic films. Early in her career she used the names "Violet" and "Violet Lust." Later,

24  Woffinden adopted the "stage name, 'Violet Blue'" for use in her pornography-related acting and

25  promotional appearances. [Defendant Woffinden's Response, *filed* 11/13/08 (Dkt. No. 6) ("Initial

26  Answer") at 3:16; Answer to FAC at 4:20-21; Costa Decl., Exh. D (Internet Movie Database

27  referencing "alternate names" for "Violet Blue": "Ada Mae Johnson / Violet Lust / Violet").]

28       The events that culminated in the present lawsuit began on October 2006, when Blue

1    discovered that journalists and other members of the public were confused by her purported

2    appearance at the "Exotic Erotic Ball," a self-styled "celebration of flesh, fetish, and fantasy,"

3    which was scheduled for the coming weekend in San Francisco. [Costa Decl., Exh. L (homepage

4    of Exotic Erotic Ball website, 2/25/08 available at http://www.exoticeroticball.com/).] Having no

5    appearances scheduled for that event, Blue learned that she had in fact been mistaken for a

6    pornographic actress, Woffinden, who was scheduled to appear at the event and whose

7    appearance was heavily advertised and promoted as an appearance by "Violet Blue." [FAC at

8    10:21-24; Costa Decl., Exh. E (Internet Archive entry reflecting the Exotic Erotic Ball

9    advertisement of Woffinden appearing as "Violet Blue").] Blue wrote an entry on her blog that

10   same day describing her experiences of being confused with a porn actress. [Costa Decl., Exh. F

11   (Blue's blog post "I am teh real VB — I am all the Violet Blue you'll ever need", 10/27/06,

12   available at http://www.tinynibbles.com/blogarchives/2006/10/i-am-teh-real-vb-i-am-all-the-

13   violet-blue-youll-ever-need.html).] Defendant Woffinden, herself aware of the mounting

14   confusion she had set in motion, admits to requesting that "Porn Star" precede her use of the

15   name "Violet Blue" in promotions for the Exotic Erotic Ball event. [Initial Answer at 6:11-13.]

16        Blue contacted Woffinden to request that she stop the use of the name "Violet Blue."

17   Woffinden acquiesced and apologized for the misuse of Blue's name, and, as recently as

18   December 2006, assured Blue that she had "finished" her career in traditional pornography and

19   that Blue's "name [would] no longer be on the front of porn boxcovers [sic] that say 'Shut up and

20   blow me' and the like." [Initial Answer, Exh. G at 2 (12/5/06 email message from Woffinden to

21   Blue).] Despite these assurances, and unbeknownst to Blue, Woffinden continued her

22   unauthorized use of Blue's valuable identity and trademark.

23        Blue continued to build her reputation and career. In January, 2007, Blue was honored as

24   one of the Internet's most influential figures in an article entitled "*Forbes* Web Celeb 25,"

25   featured in the online issue of *Forbes* magazine. [FAC at 5:17-20; Costa Decl., Exh. G (*Forbes*

26   article entitled "The Web Celeb 25," dated January 23, 2007, available at

27   http://www.forbes.com/2007/01/23/internet-fame-celebrity-tech-media-

28   cx_de_06webceleb_0123land.html; individual page regarding Blue available at

1  http://www.forbes.com/2007/01/23/web-celeb-25-tech-media_cx_de_06webceleb

2  _0123top_slides_26.html?thisSpeed=30000).] Confusion, however, continued to grow and had

3  spread to the technology community in which Blue also writes, reports, and speaks. For example,

4  in a popular on-line tech program discussing the "Forbes Web Celeb 25" awards, the hosts of

5  "This Week In Tech" mocked several of the "Web Celebs" honored by Forbes.com. [Costa Decl.,

6  Exh. H (Webpage reflecting "This Week In Tech" (Episode 86) available at http://twit.tv/86 ).]

7  When news articles drew attention to the mockery, co-host Leo LaPorte responded apologetically.

8  [Costa Decl., Exh. I (SFGate.com article "Violet Blue and the 'Moose Lodge'", February 2, 2007,

9  available at http://www.sfgate.com/cgi-bin/blogs/sfgate/detail?blogid=3&entry_id=13187).]

10  These well-known media and technology hosts believed that *Forbes* had chosen to honor

11  Woffinden, when it was in fact Blue who had been honored. [Id., Exh. I]

12        As 2007 continued, evidence that Woffinden would continue performing under Blue's

13  name mounted and it became unmistakable that confusion would not dissipate. On October 6,

14  2007, Blue received an email from a stranger at her SF Chronicle email address. Coming from a

15  purported acquaintance of Woffinden, who had performed in adult films with her, the email bears

16  the subject line: "Hey Ada" and goes on to state: "What's up, girl! I see you are writing for

17  SFgate.com now…. Very interesting." It continues with the mistaken belief that Blue is in fact

18  Woffinden: "I'll never forget you because *you were my first scene ever* …" [FAC at 11:9-17;

19  Costa Decl., Exh. J (email from D. Pounder to Blue, dated October 6, 2007, produced with Blue's

20  Fed. R. Civ. P. 26(a)(1) disclosure (VB 000096)) (emphasis added).] Blue, of course, has never

21  met nor appeared in any film (or "scene") with "Dave Pounder." For her part, Woffinden admits

22  (in *no* uncertain terms) that this intimate acquaintance was plainly confused by Woffinden's use

23  of Blue's famous name. [Initial Answer at 6:17-20 (admitting contacting Pounder to notify him of

24  his mistake).] October 2007 also brought with it the annual Exotic Erotic Ball where, once again,

25  Woffinden widely promoted her scheduled appearances as "Violet Blue" in San Francisco. [Costa

26  Decl., Exh. K (advertisements included in documents produced with Blue's Fed. R. Civ. P.

27  26(a)(1) initial disclosures bearing production numbers VB 000213-220).]

28        Shortly after this suit was filed, Woffinden announced that she had changed her name to

1    "Violetta Blue." [Costa Decl., Exh. M (Woffinden "Letter to the Editor", 11/3/07).] Specifically,

2    Woffinden writes, in the first-person, that "I'm [officially] changing my name to Violetta Blue, so

3    as to not confuse the general public of me the Pornstar with the author Violet Blue." [Id., Exh.

4    M]. This announcement was propagated to Wikipedia.org on December 10, 2007, where the page

5    describing Woffinden as "Violet Blue" had been updated by a user to reflect the change. [Id.,

6    Exh. Q (Wikipedia revision history of Defendant's entry, as it appeared on 4/3/08, available at

7    http://en.wikipedia.org/w/index.php?title=Violet_Blue_%28pornographic_actress%29&limit=500

8    &action=history).] Thereafter, another user acting at Woffinden's direction[3] made several

9    changes to the page including changing her name back to "Violet Blue." These changes appear to

10    have been made in an attempt to belatedly distinguish Woffinden's work from the work and

11    reputation of Blue, and possibly to create a record of "facts" to support her dubious position that

12    she began using the name earlier than Blue.

13        Several more recent events have, unfortunately, have made it clear that Woffinden's

14    representation to the public of her name change has been mere gamesmanship, and that

15    Woffinden intends to do everything she can to usurp Plaintiff Blue's reputation in technology and

16    education to her ill gotten advantage. For example, advertisements for the *upcoming* 2008 Exotic

17    Erotic Ball *to be held six months from now*, are already promoting an appearance by Woffinden as

18    "Violet Blue." [Costa Decl., Exh. L (Exotic Erotic Ball advertisement of appearance at the 2008

19    Ball by "Violet Blue") (available at http://www.exoticeroticball.com/)]. Moreover, Woffinden

20    continues to permit the release of additional films. Since the time this lawsuit was filed, it appears

21    she has released at least five such films under the name "Violet Blue", including one as recently

22    as March 2008. [Costa Decl., Exh. U (reproduction of the Jaded Video website showing titles in

23    which "Violet Blue" appears, 4/3/08, available at http://jadedvideo.com/VioletBlue.)] Most

---

[3] This other user evidently was acting at Woffinden's direction. [Costa Decl., Exh. W
(Wikipedia.org "User Talk: Tabercil" page including comment that: "Modifications to entries for
Violet Blue (the actress) were made at her direction by me in order to mitigate damages for the
tort of outrage. I am Robert Apgood, her counsel of record.").] This user has the same IP address
as Woffinden's counsel in this action. [*Compare* id. Exh. R (showing changes originating from
IP address 63.231.16.186, as of April 3, 2008, available at
http://en.wikipedia.org/wiki/Special:Contributions/63.231.16.186) *with* id. Exh. S (reverse-lookup
information showing IP address 63.231.16.186 originating from shark.carpelaw.com, located in
Seattle, WA, dated April 3, 2008, available at
http://www.dnsstuff.com/tools/ipall.ch?domain=63.231.16.186.)

---

1    distressing is that the most recently released of Woffinden's hard core pornographic films has the

2    theme "Nerdy Girls" which seeks to usurp Blue's reputation as a geek reporter, journalist and

3    technology expert. [Costa Decl., Exh. T ( "Kick Ass DVDs" webpage at which "Nerdy Girls" is

4    offered for sale, 4/3/08, available at http://dvds.kickass.com/cron.php?movie=453). These latest

5    moves by Woffinden clearly signal that nothing will stop her use of Blue's trademark, name and

6    persona. The accompanying confusion will persist unless Woffinden is enjoined.

7        3.    Defendants Woffinden, Assassin Pictures Inc., Assassincash.com, Bill T. Fox,
            Five Star Video L.C., And Does 1-10 Unauthorized Distribution And Complicity
8            In Infringement.

9

10    Defendants Woffinden, Assassin Pictures, Inc. ("AP"), Assassin Cash.com ("AC"), Five

11    Star Distribution Company LLC ("Five Star"), and Bill T. Fox ("Fox") (collectively

12    "Defendants") all receive income from the sale of Woffinden's infringing videos, photographs,

13    banner ads and online content in which Woffinden adopts the name "Violet Blue." Each of these

14    Defendants maintains a pivotal role in the continued proliferation of confusion among members

15    of the public who are continuously misled by Woffinden's use of the name "Violet Blue."

16    AP and AC are for-profit internet companies that facilitate the creation and operation of

17    commercial, pornographic websites on which Woffinden's content is displayed, promoted and

18    sold. The creation of VioletBlue.org was facilitated by AP and AC, as indicated on the front page

19    of the website.[4] The site requires a payment to access certain pages of the website. Each time a

20    customer of the website makes such a payment, AP and AC receive revenue. Additionally, AP

21    and AC make available to their customers links and banner ads for VioletBlue.org (known as

22    "affiliate marketing"), which generate revenue for AP and AC as a direct result of the infringing

23    content of their banner ads and at VioletBlue.org. Therefore, AP's and AC's routine distribution

24    of content in which Woffinden has adopted the name  "Violet Blue" contributes significantly to

25    the ongoing consumer confusion between Blue and Woffinden.

26    Fox is the registered owner of AssassinCash.com, which supports and receives revenue

27    _____

28    [4] Blue's early investigations of the ownership of the www.violetblue.org domain registration
    revealed that Woffinden caused the domain name to be fraudulently registered under the name of
    an unrelated California Corp. The registration has since been changed to Woffinden's name.

1  from the infringing content made available on that site. On October 25, 2007, Woffinden

2  informed Plaintiff's counsel that Fox hosts the VioletBlue.org website and receives payments

3  based on sales of content generated at that site. [*See* Declaration of Colette Vogele In Support Of

4  Plaintiff's Motion For Leave To Amend Complaint, ¶ 4]. Additionally, Fox is the named

5  custodian of record pursuant to 18 U.S.C. § 2257 for VioletBlue.org, an important federal

6  compliance role for a sexually explicit website. Fox plays a crucial role in proliferating public

7  confusion between Blue and Woffinden because he enables those websites created and supported

8  by AC and AP to continue operating and distributing content in which Woffinden uses the name

9  "Violet Blue."  Moreover, Fox receives revenue through operation of AC and AP websites and

10  profits as a result of the harm befalling Blue and the value of her VIOLET BLUE mark.[5]

11  **B.    PROCEDURAL HISTORY.**

12         Blue filed a First Amended Complaint on February 4, 2008. Woffinden answered the FAC

13  and alleged five counterclaims against Plaintiff. Blue moved this Court to strike the fifth

14  counterclaim, for "outrage," under Cal. Code Civ. Proc § 425.16 (the Anti-SLAPP motion) and

15  award Blue her attorneys' fees and costs (§ 425.16(c)).  Blue also moved to dismiss Woffinden's

16  third and fourth counterclaims without leave to amend under Fed. R. Civ. P. 12(b)(6), for failure

17  to state a claim under which relief can be granted. On March 11, 2008, this Court issued

18  Summonses for the remaining named Defendants. Defendants Assassin Pictures and Assassincash

19  were served on March 20, 2008. Bill Fox was served on April 2, 2008. To date, Blue has been

20  unable to locate Defendant Five Star for service.

21

22

23

24  _____

[5] Five Star operates an internet company that facilitates creation of virtual "adult super stores"
that sell pornographic DVD and VHS movies, and adult toys, including those in which Woffinden
adopts the name "Violet Blue." Furthermore, Five Star distributes and receives revenue for each

25  of the infringing adult products it sells. According to Woffinden, "Five Star Video
(www.fivestarfc.com) set up, ran and maintained the Defendant's online store

26  www.movies.violetblue.org." [Initial Answer at 4:14-16.]  It is through Five Star's virtual stores
and subsequent distribution of DVD and VHS movies that products, in which Woffinden adopts

27  the name "Violet Blue," reach the public and continually create public confusion. As of the time
this Motion is being filed, Plaintiff has been unable to serve Five Star, and was informed verbally
by an individual representing himself to be one of Five Star's corporate founders that it is no

28  longer in operation. Plaintiff's investigation concerning these circumstances is ongoing at this
time.

1

## III.  ARGUMENT.

2

## A.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION.

3      "Injunctive relief is the remedy of choice for trademark and unfair competition cases,

4  since there is no adequate remedy at law for the injury caused by a defendant's continuing

5  infringement. It is the remedy provided by federal and state trademark infringement statutes."

6  Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 - 1181 (9th Cir. 1988) (citing 15

7  U.S.C. § 1116(a); Cal. Bus. & Prof. Code §§ 14330, 14340, 17200 et seq.); *see also* Int'l Kennel

8  Club of Chicago v. Mighty Star, Inc., 846 F.2d 1079 (7th Cir. 1988). Under long-standing Ninth

9  Circuit precedent:

10      The traditional equitable criteria for granting preliminary injunctive relief are (1) a
        strong likelihood of success on the merits, (2) the possibility of irreparable injury to
11      plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the
        plaintiff, and (4) advancement of the public interest (in certain cases). [Citations
12      omitted.] In this circuit, the moving party may meet its burden by demonstrating either
        (1) a combination of probable success on the merits and the possibility of irreparable
13      injury or (2) that serious questions are raised and the balance of hardships tips sharply in
        its favor. [6]

14

15      Los Angeles Memorial Coliseum Com. v. National Football League, 634 F.2d 1197,

16  1200-1201 (9th Cir. 1980). *See also* Grocery Outlet Inc. v. Albertson's Inc., 497 F.3d 949, 951

17  (9th Cir. 2007); Sardi's Rest. Corp. v. Sardie, 755 F.2d 719, 723 (9th Cir. 1985); Miss Universe,

18  Inc. v. Flesher, 605 F.2d 1130, 1134 (9th Cir. 1979) (citations omitted). These are not two

19  separate tests, but rather "represent two points on a sliding scale in which the required degree of

20  irreparable harm increases as the probability of success decreases." A&M Records, Inc. v.

21  Napster, Inc. 239 F.3d 1004, 1013 (9th Cir. 2001) (quotations marks and internal citations

22  omitted). In its preliminary injunction analysis, a court need only find a *probability* that the

23  necessary facts can be proved, not that they will be proven.  Sierra Online, Inc. v. Phoenix

24  Software, Inc., 739 F.2d 1415, 1423 (9th Cir. 1984).

25      Because facts sufficient to establish the elements of her trademark infringement,

26  trademark dilution, unfair competition, and violation of Cal. Civ. Code. § 3344 claims have been

27  ───────────────
[6] The same preliminary injunction standard applies to actions involving registered and
28  unregistered trademarks.  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1204 n.3 (9th Cir.
    2000) (citing Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d
    1036, 1046 n.8 (9th Cir. 1999).

1   admitted by the Defendant, Plaintiff Blue is likely to succeed on the merits of those claims.

2   Furthermore, because of the very nature of the harm suffered by one whose trademark is infringed

3   and diluted, Plaintiff Blue will suffer irreparable harm if a preliminary injunction is not issued in

4   this case. The balance of hardships, and the concerns of public interest in this case both weighs

5   heavily in favor of Plaintiff. Therefore, an  injunction should be granted.

6   **B.    BLUE HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF HER

7   TRADEMARK INFRINGEMENT, TRADEMARK DILUTION, UNFAIR
    COMPETITION, AND RIGHT OF PUBLICITY CLAIMS.**

8           1.      Trademark Infringement And Unfair Competition.[7]

9           To establish a claim of trademark infringement, where the functionality of the mark is not

10  at issue, Plaintiff Blue must prove (i) that she has a protectable right (e.g., that her mark is

11  capable of functioning as a trademark), and (ii) likelihood of confusion.  Kendall-Jackson Winery

12  v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998) (elements of a claim under 15

13  U.S.C. §1125 are, "(1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion.").

14  See also McCarthy on Trademarks and Unfair Competition §§ 27:14, 27:18 (4th ed. Supp. 2006)

15  ("McCarthy").

16          a.      Blue Has Protectable Rights In The VIOLET BLUE Mark.

17          Trademark holders may demonstrate ownership of a valid mark, and the requisite

18  protectable interest, in any one of the following ways: "(1) it has a federally registered mark in

19  goods or services; (2) its mark is descriptive but has acquired a secondary meaning in the market;

20  or (3) it has a suggestive mark, which is inherently distinctive and protectable." Applied

21  Information Sciences Corp. v. eBAY, Inc., 511 F.3d 966, 970 (9th Cir. 2007).

22          Registration of a trademark on the Principal Register in the Patent and Trademark Office

23  "constitutes prima facie evidence of the validity of the registered mark and of [the registrant's]

24  exclusive right to use the mark on the goods and services specified in the registration." Id., (citing

---

25  [7] "Common law claims of unfair competition and actions pursuant to Cal. Bus. & Prof. Code §
    17200 (defining unfair competition as including unlawful, unfair, or fraudulent business acts or

26  practices) are 'substantially congruent' to claims made under the Lanham Act." Microsoft Corp.
    v. Evans, 2007 U.S. Dist. LEXIS 77088 (D. Cal. 2007) (Quoting Cleary v. News Corp., 30 F.3d

27  1255, 1262-63 (9th Cir. 1994)). Whether the violation is called infringement, unfair competition,
    or false designation of origin, the test is identical.  Two Pesos v. Taco Cabana, 505 U.S. 763, 780
    (1992) (citing New W. Corp. v. NYM Co., 595 F.2d 1194, 1201 (9th Cir. 1979)). Accordingly,

28  the arguments in this section regarding Woffinden's federal trademark infringement, are equally
    applicable to Blue's state unfair competition claims.

---

1   Brookfield Commc'ns v. West Coast Entertainment Corp., 174 F.3d 1036, 1047 (9th Cir. 2005));

2   15 U.S.C. § 1057(b). Moreover, registration "discharges the plaintiff's original common law

3   burden of proving validity in an infringement action." Applied Information Sciences Corp., 511

4   F.3d at 970; citing to Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d

5   925, 928 (9th Cir. 2005). Therefore, Blue's registration of the VIOLET BLUE mark on the

6   Principal Register of the US Patent and Trademark Office on March 4, 2008, constitutes prima

7   facie evidence of the validity of the registered mark VIOLET BLUE and of Blue's exclusive right

8   to use the mark on the goods and services described in that registration. [Costa Decl., Exh. V (US

9   Patent and Trademark Office Registration No. 3,391,010 for the mark "VIOLET BLUE").[8]

10              b.    A Likelihood Of Confusion Exists Between The Marks.

11          Trademark infringement claims hinge on the "likelihood of confusion" between the

12  plaintiff's mark, and the use made by the defendant.  Brookfield Communs. v. W. Coast Entm't

13  Corp., 174 F.3d 1036 (9th Cir. 1999). The Ninth Circuit has traditionally employed a multifactor

14  test to determine the likelihood of confusion. The factors to be weighed are the: (i) strength of the

15  mark; (ii) proximity of the goods; (iii) similarity of the marks; (iv) evidence of actual confusion;

16  (v) marketing channels used; (vi) type of goods and the degree of care likely to be exercised by

17  the purchaser; (vii) defendant's intent in selecting the mark; and (viii) likelihood of expansion of

18  the product lines. Jada Toys, Inc. v. Mattel, Inc., __ F.3d. __, 85 U.S.P.Q.2D (BNA) 1895, 2008

19  U.S. App. LEXIS 3627 at **6 (9th Cir. Feb. 21, 2008) (citing AMF, Inc. v. Sleekcraft Boats, 599

20  F.2d 341, 348-49 (9th Cir 1979)). Each factor is discussed in turn below.

21  ────────────────────
    [8] Even forgoing this presumption of validity, Blue still maintains a protectable interest in the
    VIOLET BLUE mark as a result of her continuous and substantial use of the mark to identify her
22  goods (e.g., books, articles, etc.) and services (e.g., podcast series, academic lectures, etc.) in
    commerce for nearly a decade.  Although "personal name" trademarks are typically classified as
23  descriptive, such marks are nonetheless valid where they have acquired a secondary meaning. See
    Applied Information Sciences Corp., 511 F.3d at 970. The Supreme Court clarifies this
    requirement by providing, "[a]mark has acquired distinctiveness, even if it is not inherently
24  distinctive, if it has developed secondary meaning, which occurs when, 'in the minds of the
    public, the primary significance of a [mark] is to identify the source of the product rather than the
    product itself.'"  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210 (2000) (citing
25  Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 851 (1982). A prima facie case
    for such secondary meaning can be made by showing "proof of substantially exclusive  and
26  continuous use thereof as a mark by the applicant in commerce for the five years before the date
    on which the claim of distinctiveness is made." 15 U.S.C. §1052(f). For nearly ten years, twice
27  the time period needed to gain the presumption of secondary meaning under §1052(f), Blue has
    established a reputation under the VIOLET BLUE mark, such that the public specifically
    associates the goods and services bearing the VIOLET BLUE mark as originating from Blue.
28  Blue's continuous and substantially exclusive use of the VIOLET BLUE mark renders it
    distinctive and, therefore, sufficiently distinctive to confer a protectable interest in the mark.

1              (i)      Strength Of The Mark.

2        The strength of a mark is evaluated on a sliding scale, with arbitrary or fanciful marks

3    being afforded the strongest protection and generic marks being offered none at all.  <u>AMF</u>, 599

4    F.2d at 349.  Though here the mark, owing solely to the fact that it is a proper name, may be

5    considered descriptive under ordinary trademark rules, McCarthy § 13:2; <u>E. & J. Gallo Winery v.</u>

6    <u>Gallo Cattle Co.</u>, 967 F.2d 1280, 1291 (9th Cir. 1992), the VIOLET BLUE trademark should

7    nonetheless be held to be a strong mark for two reasons: (i) it has received federal registration on

8    the principal trademark register, and (ii) it has attained secondary meaning.

9        During prosecution of the VIOLET BLUE trademark, Blue received no objection on the

10   basis that VIOLET BLUE was descriptive. In such situations, "the registrant enjoys a

11   presumption that the purchasing public perceives the mark to be inherently distinctive."

12   <u>Quiksilver, Inc. v. Kymsta Corp.</u>, 466 F.3d 749, 760 (9th Cir. 2006) (citing <u>Lane Kapital Mgmt.,</u>

13   <u>Inc. v. Lane Capital Mgmt., Inc.</u>, 192 F.3d 337, 345 (2d Cir. 1999)); <u>Abercrombie & Fitch Co. v.</u>

14   <u>Hunting World, Inc.</u>, 537 F.2d 4, 11 (2d Cir. 1976). ("The decision of the Patent Office to register

15   a mark without requiring proof of secondary meaning affords a rebuttable presumption that the

16   mark is suggestive or arbitrary or fanciful rather than merely descriptive."); 15 U.S.C. § 1052(f).

17   It is well settled that trademarks classified within the inherently distinctive category, including

18   suggestive, arbitrary, and fanciful marks, are stronger and deserving of protection because their

19   "intrinsic nature serves to identify particular source of product." <u>Two Pesos, Inc.</u>, 505 U.S. at 768

20   (1992). Accordingly, the VIOLET BLUE mark is inherently distinctive and presumptively

21   stronger than a merely descriptive mark because it has acquired secondary meaning.

22       Additionally, beyond the presumption afforded by the PTO's registration of the VIOLET

23   BLUE trademark on the principal register, the VIOLET BLUE trademark has attained a

24   presumption of secondary meaning through the near decade of its continuous and substantially

25   exclusive use. <u>California Cooler, Inc.</u>, 774 F.2d 1451, 1453 (9th Cir. 1985); 15 U.S.C. § 1052(f)

26   (Proof of "substantially exclusive and continuous use" for the five years preceding application for

27   registration is acceptable as prima facie evidence of secondary meaning under subsection (f)).

28   Since 2001, Blue has continuously used and applied the VIOLET BLUE trademark in all of her

1    commercial work, including books, lectures, podcasts, etc. Notwithstanding the fact that

2    Woffinden has *in*consistently used the stage-name "Violet Blue" at various times during that

3    period, inconsequential or infringing use by third parties does not operate to defeat a showing of

4    substantial exclusivity. *See* Nike, Inc. v. Nikepal Intern., Inc., 2007 WL 2782030 at 7 (slip op.),

5    84 U.S.P.Q.2D (BNA) 1521 (E.D. Cal., 2007); L.D.Kichler Co. v. Davoil Inc., 192 F.3d 1349,

6    1352 (Fed.Cir. 1999). Because Plaintiff has established a presumption of secondary meaning by

7    virtue of her registration of the VIOLET BLUE  trademark, without having to prove secondary

8    meaning, and her long-time and continuous use of the trademark VIOLET BLUE, this factor

9    should weigh in favor of the Plaintiff.

10                              (ii)     Proximity Of The Goods.

11           Analysis of the proximity of the goods likewise favors Blue. "For related goods, the

12    danger presented is that the public will mistakenly assume there is an association between the

13    producers of the related goods, though no such association exists." AMF, 599 F.2d at 350. Here,

14    both Blue and Woffinden operate in the production and distribution of content generally of an

15    adult subject matter. Many of Blue's services and goods are designed to educate individuals with

16    information about sexual health, sexual pleasures, pornography and technology. Blue's work

17    focuses on providing access to accurate sexual health information, including safer-sex guidelines,

18    through advice and various associations. Any product that she endorses or with which she

19    associates her brand are focused on sexual health and sexual safety, including emotional sexual

20    safety.

21           Woffinden's services and goods are centered on hard core sexual performances where she

22    engages in explicit sex acts on film as well as discusses and promotes such acts in various forms

23    of media (internet radio, terrestrial radio, on her website, on-line video etc.). Through her

24    participation in the hard core porn industry, she endorses many extremely unsafe sex acts. For

25    example, she routinely demonstrates unprotected sex, unprotected sex with strangers and/or

26    multiple partners, scenarios that appear to be degrading and/or painful, unsafe sex acts (such as

27    anal-to-vaginal penetration, anal-to-oral penetration), and other potentially harmful acts (such as

28    large anal insertions with no evidence of preparation, and female sexual humiliation without

1    context).

2         While plainly not identical, the natural and inherently close proximity of these sex-related

3    services and goods cannot be disputed. As such, consumers are likely to assume a high degree of

4    association between the two. Id. This association is especially damaging in this case because the

5    goods and services offered by the hard-core porn industry and Woffinden are antithetical to the

6    safe-sex messages and healthy-information provided by Blue under her VIOLET BLUE

7    trademark. Having built a valuable trademark and a career in promoting sex-positive education

8    and attitudes, Plaintiff Blue can least afford to be connected in the minds of consumers with the

9    sort of unsafe sexual practices and products and hard core pornography Woffinden vends under

10   the stage name "Violet Blue." This present, actual, and mistaken assumption of association,

11   already so damaging to Plaintiff Blue, must tip the balance of this factor heavily in favor of

12   Plaintiff Blue.

13                          (iii)    Similarity Of The Marks.

14        The factor concerned with the similarity of the marks must favor the Plaintiff in this case.

15   Plaintiffs registered trademark is VIOLET BLUE. Defendant Woffinden's stage-name is "Violet

16   Blue." The two marks in question are, quite simply, identical. For that reason, this factor must

17   heavily favor Plaintiff in this case.  In re Martin's Famous Pastry Shoppe, Inc., 748 F.2d 1565

18   (Fed. Cir. 1984) (Identically of marks weighs heavily in favor of registrant).

19                          (iv)    Evidence Of Actual Confusion.

20        The ready and admitted evidence of actual confusion in this case must tip this factor

21   heavily in favor of Plaintiff Blue. "Evidence that use of the two marks has already led to

22   confusion is persuasive proof that future confusion is likely." AMF, 599 F.2d at 350 citing

23   Plough, Inc. v. Kreis Laboratories, 314 F.2d 635 (9th Cir. 1963). As Plaintiff Blue has recounted

24   at length in prior briefing, there is ample evidence in the record of this case of actual confusion.

25   FAC at 10:17-11:21; Plaintiff Violet Blue's Notice Of Motion And (1) Special Motion To Strike

26   Fifth Counterclaim As A Meritless S.L.A.P.P. Pursuant To Cal. Code Of Civ. P. § 425.16; And

27   (2) Motion To Dismiss The Third And Fourth Counterclaims ("Motion to Strike") (Docket No.

28   42) at 5:1-7:2; supra at Section II.A.2.] Woffinden herself has even admitted several instances of

1  actual confusion. *See e.g.,* Initial Answer at 6:11-13 (admitting that she "requested that the word

2  'Pornstar' [be added to her name at] the Exotic Erotic Ball so the public would not confuse her

3  with [Blue]"); <u>id.</u> at 6:16-17 (admitting to the actual confusion of "Dave Pounder," an intimate

4  acquaintance of Woffinden); <u>id.</u> at 9:1-3 (admitting she received emails evidencing confusion

5  from members of the public who believed they were writing to Blue); <u>id.</u> at 9:12-13 (admitting

6  she had "changed her to 'Violetta Blue' to avoid confusion to the public"); <u>id.</u> 10:16-17

7  (admitting to "[making] contact with her webmaster and [asking] that the name Violet Blue be

8  changed to Violetta Blue, so as to avoid confusion"); <u>id.</u> at 12:1-2 (admitting further confusion).

9  Because evidence of actual confusion is exceptional, "this factor is weighed heavily … when

10  there is evidence of past confusion." <u>AMF</u>, 599 F.2d at 353. Where, as in the case at hand, there is

11  not only evidence of past and continuing confusion but admission thereto, this factor must heavily

12  favor Plaintiff Blue.

13  (v)     Marketing Channels Used.

14  This factor favors Plaintiff Blue because of the similarity of the marketing channels used.

15  "Convergent marketing channels increase the likelihood of confusion." <u>AMF</u>, 599 F.2d at 353.

16  *See also* McCarthy at § 24.6.  Here, it is without a doubt that both parties market, sell, and

17  distribute their goods primarily through the internet. [*See, e.g.,* Answer to FAC at 11:22-23;

18  16:18-21 (admitting to use of identical marketing channels); Costa Decl., Exhs. N (the homepage

19  of Blue's website, dated April 1, 2008, available at http://www.tinynibbles.com), O (the

20  homepage of Woffinden's commercial website, http://www.violetblue.org, as it appeared on

21  October 19, 2007).] Because of these identical marketing channels, there is a high likelihood that

22  an individual consumer will have access to, and be aware of, the works of both Plaintiff Blue and

23  Defendant Woffinden. <u>Brookfield Communs. v. W. Coast Entm't Corp.</u>, 174 F.3d 1036, 1057

24  (9th Cir. 1999) (when both parties utilize the Web as a marketing and advertising facility, courts

25  have recognized a higher likelihood of confusion). This use of identical marketing channels

26  should tip this factor heavily in favor of Plaintiff Blue.

27  (vi)     Type Of Goods And The Degree Of Care Likely To Be
Exercised By the Purchaser.

28

---

1    The "degree of care" factor must also tip heavily in favor of Plaintiff Blue because the

2    extremely low cost of the goods and services at issue will reduce the degree of care likely to be

3    exercised by the consuming public. "In assessing the likelihood of confusion to the public, the

4    standard used by the courts is the typical buyer exercising ordinary caution." <u>AMF</u>, 599 F.2d at

5    353; *see also* <u>HMH Publishing Co. v. Lambert</u>, 482 F.2d 595, 599 n. 6 (CA 9 1973). As the price

6    of a good increases, the typical buyer will naturally exercise a high degree of caution. <u>Id</u>. In the

7    case at hand, many of the goods and services of Blue, consisting primarily of writings and other

8    content publicly accessible on the internet, are predominantly distributed entirely free of charge

9    or at a relatively low cost. As a result, the typical consumer will naturally exercise the level of

10   care appropriate for one preparing to receive free good or service: very little, or none at all. This

11   low degree of care on the part of consumers greatly increases the likelihood that confusion

12   between Blue and the Woffinden will result. *C.f.,* <u>AMF</u>, 599 F.2d at 353 (lesser chance for

13   confusion as the price of goods and care of consumers increase). The relatively low cost of Blue's

14   goods in this case, and the accompanying low degree of consumer care likely to be exercised,

15   must tip this factor heavily in favor of Plaintiff Blue.

16                    (vii)    Defendant's intent in selecting the mark.

17          "When the alleged infringer knowingly adopts a mark similar to another's, reviewing

18   courts presume that the defendant can accomplish [her] purpose: that is, that the public will be

19   deceived." <u>AMF</u>, 599 F.2d at 354 (*citing* <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 314

20   F.2d 149 at 157-58 (9th Cir. 1963); *See* <u>Friend v. H. A. Friend & Co.</u>, 416 F.2d 526 (CA 9 1969);

21   <u>C.f. International Luggage Registry v. Avery Products Corp.</u>, 541 F.2d 830 (CA 9 1976)). Here,

22   there are at least two periods in which Woffinden chose to use VIOLET BLUE trademark.

23   Initially, the Defendant claims that she chose to adopt Plaintiff Blue's trademark sometime in

24   2000, when  she claims to have been unaware of the use being made by Plaintiff Blue. [Initial

25   Answer at 8:16-19; Answer to FAC at 23:3-4.]

26          More importantly, and more relevant for purposes of a preliminary injunction, Defendant,

27   admits to having used several names and not just "Violet Blue" during her career. She also

28   promised Plaintiff Blue as recently as December 2006 that she had "finished" her career in

1   pornography. [Initial Answer, Exh. G at 2 (12/5/06 email message from Woffinden to Blue).]

2   Additionally, after a recent period of styling herself "Violetta Blue," [Costa Decl., Exh. M], she

3   appears to have readopted the stage-name "Violet Blue" *during the pendency of this very*

4   *litigation.* Regardless of her state of mind some years ago, Defendant was clearly aware of the use

5   being made by Plaintiff Blue when she re-adopted the name "Violet Blue." [Costa Decl., Exh.

6   Q.] And Woffinden continues to chose to readopt that very stage-name for use in an upcoming

7   appearance at the Exotic Erotic Ball 2008. While her initial use of the name Violet Blue already

8   supports this point, the re-adoption of the mark by the Woffinden, with full and undisputable

9   knowledge of Plaintiff Blue's use, must tip this factor heavily in favor of Plaintiff Blue.

10                  (viii)    Likelihood of expansion of the product lines.

11          "Inasmuch as a trademark owner is afforded greater protection against competing goods, a

12   strong possibility that either party may expand his business to compete with the other will weigh

13   in favor of finding that the present use is infringing." AMF, 599 F.2d at 354 (internal quotations

14   omitted). As discussed above, *supra* Section B.2.b.(ii), Defendant Woffinden's use of the

15   VIOLET BLUE trademark on traditional hard-core pornographic entertainment is closely in the

16   market to Blue's work. Any expansion by Defendant would cause immediate and further harm to

17   Blue. Indeed, Defendant has already begun to expand her use of the stage-name "Violet Blue"

18   well beyond the pornographic scenes recorded in the past, to the very field in which Plaintiff Blue

19   is most celebrated: sexual information and education. [Costa Decl., Exh. P (email describing

20   recent work on a "guide" video regarding "Pregnant Sex".)] Woffinden also appears be

21   expanding her range as a porn actress into themes related to technology and geek culture, core

22   attributes of Plaintiff Blue's use of her trademark and her persona. For example, Woffinden's

23   latest film – *released just last month* – has her appearing as "Violet Blue" in hard core porn

24   scenes as a "Nerdy Girl." Woffinden, having built her career around the subject of hard core

25   pornographic sex, will no doubt continue to encroach upon the boundaries of Plaintiff Blue's

26   protected trademark should she be allowed to continue unabated. The fact that that the goods and

27   services of Plaintiff Blue and the Defendant have begun to overlap, and will naturally overlap

28   even more closely in the future, must tip this factor heavily in favor of the senior user, Plaintiff

1   Blue. <u>Interstellar Starship Services, Ltd. v. Epix Inc.</u>,184 F.3d 1107, 1111 (9th Cir. 1999)("[T]he

2   likelihood of confusion is greater if either or both parties might expand their offered products and

3   services to overlap. . . . Whether or not Epix and ISS currently compete head-to-head, the

4   possibility that they will in the future must be considered." [internal citation omitted].)

5       "Having established a protectable interest by proving [she] is the owner of a registered

6   trademark, the owner does not additionally have to show that the defendant's allegedly confusing

7   use involves the *same* goods or services listed in the registration." <u>Applied Information Sciences

8   Corp. v. eBAY, Inc.</u>, 511 F.3d 966, 971 (9th Cir. 2007). Rather, Plaintiff's Blue's rights to protect

9   her VIOLET BLUE trademark extends to any use that is likely to cause confusion. *See* <u>Id</u>.

10  Therefore, regardless of whether Defendant Woffinden's work is expanding to include Plaintiff

11  Blue's precise field of work, there remains a significant likelihood of confusion in light of the

12  natural overlap between Plaintiff's and Defendant's respective industries.  *See supra* at B.1.b.(ii).

13      Because each factor in the likelihood of confusion analysis favors Blue, she is likely to

14  succeed on the merits of that claim. <u>AMF,</u> 599 F.2d at 348-49.

15      2.    Trademark Dilution.

16      Plaintiff Blue will likely succeed on the merits of her Federal Trademark Dilution claim as

17  well. The Trademark Dilution Revision Act of 2006 ("TDRA") states that "the owner of a famous

18  mark that is distinctive . . . shall be entitled to an injunction against another person who, at any

19  time after the owner's mark has become famous, commences use of a mark or trade name in

20  commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous

21  mark." 15 U.S.C. § 1125(c) (as amended October 6, 2006). "[I]njunctive relief is available under

22  the Federal Trademark Dilution Act if a plaintiff can establish that (1) its mark is famous; (2) the

23  defendant is making commercial use of the mark in commerce; (3) the defendant's use began

24  after the plaintiff's mark became famous; and (4) the defendant's use presents a likelihood of

25  dilution of the distinctive value of the mark." <u>Perfumebay.com Inc. v. eBay Inc.</u>, 506 F.3d 1165,

26  1180 (9th Cir. 2007).[9]

27  _____
    [9] None of the defenses or exceptions recognized by the TDRA are applicable here.  15 U.S.C. §
28  1125(3)(A) (dilution that constitutes fair use is not actionable); 15 U.S.C. § 1125(3)(B) (dilution
    through news reporting and news commentary is not actionable); 15 U.S.C. § 1125(3)(C)
    (dilution through noncommercial uses of the mark are not actionable).

With regards to the first element, the fame of a mark, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation or source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). The TDRA also lists four non-exclusive, but relevant, considerations to determine fame, including (a) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (b) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (c) the extent of actual recognition of the mark; (d) whether the mark was registered . . . under the principal register.  15 U.S.C. § 1125(c)(2)(A)(i)-(iv).  Here, Plaintiff's mark, VIOLET BLUE, is famous because she has been recognized as a premier sexual health commentator and writer throughout California, throughout the country, and throughout the world since 1999.  [FAC at 6:7-9.] For example, Blue writes a weekly newspaper column "Open Source Sex," which appears at SFGate.com, the website of *The San Francisco Chronicle* newspaper, an established news publication whose website attracts a monthly audience of over four million unique visitors.  [FAC at 5:21-25]. Blue is recognized by Forbes Magazine, The Wall Street Journal, and numerous web-blogs and news sources on the Internet as a specialist in her field.  [*See, e.g.,* Costa Decl., Exhs. A (*Wall Street Journal* article, "Now Playing on Apple's iTunes: Adult-Oriented Podcasts;" G (Forbes article, "The Web Celeb 25."] Blue has, moreover, authored seventeen books on the topic of human sexuality and safer sex practices which have been translated into four languages, with more translations forthcoming.  [FAC at 5:14-6:3].

Plaintiff Blue satisfies the second and third elements of the TDRA by demonstrating that Defendant's use of Plaintiff Blue's mark in a commercial capacity occurred after Blue's mark became famous. With regards to the Defendant's use of the VIOLET BLUE mark in commerce, Woffinden has freely admitted as much.  [Answer to FAC at 9:23-24; 11:2, 22-23; 13:12-15; 14:17-19; 16:2-4, 18-21; 17:18-20, 22-25; 22:19-20; 23:2, 15-19; 24:22-24; 26:22-25 (alleging use in commerce sufficient to support Defendant's own alleged use as a trademark)]. Thus, Plaintiff Blue satisfies the second prong of the TDRA. As to the third element, addressing the point at which Defendant begin using Blue's famous mark, Defendant only began using Plaintiff Blue's mark as her "stage name" after Blue was already an established writer and commentator.

1   [FAC at 4:19-24; Initial Answer at 3:16-17].  Thus, Defendant's commercially driven use of

2   Plaintiff Blue's mark only began after Plaintiff Blue's mark became famous.

3        While the TDRA abrogated the fourth requirement in the original federal test, which

4   required that a plaintiff prove actual harm, the TDRA and courts have recognized that "evidence

5   of harm is still helpful as an additional means of determining whether dilution is likely to occur as

6   a result of a defendant's accused use." Nissan Motor Co. v. Nissan Computer Corp., 2007 U.S.

7   Dist. LEXIS 90487 (D. Cal. 2007); see also Autozone, Inc. v. Strick, 466 F. Supp. 2d 1034, 1044

8   (E.D. Ill. 2006) (noting that even under the TDRA, "[p]laintiffs . . . still bear the burden or

9   showing at least a likelihood of dilution).  With regards to the likelihood of dilution, the Ninth

10  Circuit further notes that "when identical marks are used on similar goods, *dilution . . . obviously*

11  *occurs.*" *See also* Am. Honda Motor Co. v. Pro-Line Protoform, 325 F. Supp. 2d 1081, 1085 (9th

12  Cir. 2004) (emphasis added) (citing Moseley v. V. Secret Catalogue, Inc., 537 U.S. 418, 434

13  (2003) (superseded by statute) ("It may well be, however, that direct evidence of dilution such as

14  consumer surveys will not be necessary if actual dilution can reliably be proved through

15  circumstantial evidence – *the obvious case is one where the junior and senior marks are*

16  *identical*.") (emphasis added).  Here, Plaintiff Blue's personal name and mark, VIOLET BLUE,

17  is identical to the "stage name" that Defendant Woffinden uses in and on her pornography-related

18  merchandise, advertisements, and live appearances.  The Ninth Circuit recognizes that, in such a

19  case, there exists a presumption that dilution has occurred and will continue to occur.  Am. Honda

20  Motor Co., 325 F. Supp. 2d at 1085.

21       The TDRA recognizes two types of dilution, "dilution by blurring" and "dilution by

22  tarnishment," of a famous mark. 15 U.S.C. § 1125(1). The Ninth Circuit recognizes that "[t]o find

23  dilution, a court need not rely on the traditional definitions such as "blurring" and "tarnishment."

24  Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1327 (1998). Dilution by blurring occurs "when

25  a defendant uses a plaintiff's trademark to identify the defendant's goods or services, creating the

26  possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's

27  product." Id. at 1327, n. 7. (citing Ringling Bros.-Barnum & Bailey, Combined Shows, Inc. v.

28  B.E. Windows, Corp., 937 F. Supp. 204, 209 (S.D.N.Y. 1996) (citations omitted). Here,

1  Woffinden admits that her use of Plaintiff Blue's mark has created actual confusion such that

2  Plaintiff Blue's registered mark VIOLET BLUE is likely to lose its unique ability to identify

3  Plaintiff Blue's products and services. *See, supra* at II.B.1.b.(iv)]. Thus, dilution by blurring is

4  without doubt likely to be found in this case.

5        Dilution by tarnishment requires that a famous mark must be "improperly associated with

6  an inferior or offensive product or service." Ringling Bros., 937 F. Supp. At 209 (citing Hormel

7  Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 506 (2d. Cir. 1996)).  The TDRA states that

8  tarnishment occurs when an "association arising from the similarity between a mark or trade

9  name and a famous mark . . . harms the reputation of the famous mark." 15 U.S.C.S.

10  § 1125(c)(2)(C).  Here, Woffinden's use tarnishes Plaintiff Blue's registered mark because the

11  consuming public is especially likely to associate Plaintiff Blue's special writing and

12  commentating expertise in such areas as human sexuality, sexual health, and sex-education, with

13  Woffinden's pornography-related acting, videos, merchandise, advertisements, and live

14  appearances. Here, this association is especially damaging to Plaintiff who, having built a

15  valuable trademark and a career around main-stream sex-positive education and entertainment,

16  can least afford to be associated with the hard core pornography offered by Defendant. Thus, Blue

17  has a likelihood of success on the merits of a Federal Trademark Dilution claim under either a

18  theory of tarnishment, or one of blurring.

19        3.    Blue Is Likely To Succeed On The Merits Of Her Claim That Woffinden's
20                 Unauthorized Use Of Plaintiff Blue's Name and Likeness Violates Cal. Civ. Code
               § 3344.

21

22        Plaintiff Blue also has a likelihood of success on the merits of a claim against Defendant

23  Woffinden under Cal. Civ. Code § 3344(a), California's Right of Publicity statute.  California's

24  Right of Publicity statute requires that, "[a]ny person who knowingly uses another's name, voice,

25  signature, photograph, or likeness, in any manner on or in products, merchandise, or goods, or for

26  purposes of advertising or selling, or soliciting purchases of products, merchandise, goods or

27  services, without such person's prior consent, . . . shall be liable for any damages sustained by the

28  person or persons injured as a result thereof." Cal. Civ. Code § 3344(a). Here, Defendant

1    knowingly adopted (and re-adopted) Plaintiff Blue's legal personal name "Violet Blue," as her

2    "stage name," for use in her pornography-related acting and appearances.  [Initial Answer at 3:16-

3    19]. Plaintiff Blue has never given Defendant consent to use Plaintiff Blue's personal name. In

4    fact, Plaintiff Blue contacted Defendant in 2006, requesting that Defendant cease use of the name

5    "Violet Blue." Following Defendant's feigned acquiescence and apology for the use of Plaintiff

6    Blue's personal name, Defendant's continued use of Plaintiff Blue's name in and on pornographic

7    merchandise, at live appearances, and in advertisements promoting purchase of her goods and

8    services, demonstrates Defendant's knowledge of the inappropriate use of Plaintiff Blue's name

9    in violation of Cal. Civ. Code § 3344(a).  *See, supra* at II.A.2.

10         Furthermore, Defendant's inappropriate uses of Plaintiff Blue's name has, at all times,

11   been directly connected with the commercial advertising and sponsorship of her pornography-

12   related acting, merchandise, and appearances, evidencing a uses for which consent is required

13   under California's Right of Publicity statute. Thus, because Plaintiff Blue never gave Defendant

14   consent to use her personal name for commercial purposes, and in fact demanded that Defendant

15   stop the use of her stage name "Violet Blue," Plaintiff Blue has a likelihood of success on the

16   merits under Cal. Civ. Code § 3344(a).

17   **C.    Blue Will Suffer Irreparable Harm If An Injunction Is Not Issued.**

18         In considering injunctive relief for trademark cases, the Supreme Court has long

19   recognized that irreparable harm will be found when, as here, there is a high likelihood of

20   confusion.  *See* L.E. Waterman Co. v. Modern Pen Co., 235 U.S. 88 (1914) (Justice Holmes

21   affirming a judgment enjoining defendant from using the Waterman name, even though one of

22   defendant's partners had that name, because of the likelihood of confusion with plaintiff's

23   competing product was high). Here, the likelihood of confusion is at the highest level possible:

24   actual confusion on numerous occasions has been freely admitted by the Defendant in papers

25   filed this very case. As noted above, in October 2006, several journalists and a number of Blue's

26   acquaintances confused Woffinden the porn actress for Blue, after seeing advertisements stating

27   that "Violet Blue" (in fact Woffinden) would be "a host" appearing at San Francisco's "Exotic

28   Erotic Ball," when in fact Blue had no appearances scheduled for that event.  [FAC at 10:17-26].

1    In January 2007, the hosts of "This Week In Tech," a popular on-line audio program, mistakenly

2    confused Blue, who was honored as one of twenty-five "Forbes Web Celebs," with Woffinden

3    the Porn Actor.  [FAC at 10:27-6:8].  Co-host Leo LaPorte later responded apologetically to this

4    confusion. [Costa Decl. Exh. I].  In October 2007, "Dave Pounder," a purported acquaintance of

5    Woffinden, was plainly confused by Woffinden's use of Blue's personal name and mark,

6    VIOLET BLUE, when he emailed Blue with the subject line: "Hey Ada" and a subsequent

7    message that plainly mistook Blue for Woffinden. [FAC at 11:9-17].

8        The Ninth Circuit has also recognized that, in trademark matters, "irreparable injury will

9    almost always be found when there is a high probability of confusion . . . ." Sardi's, 755 F.2d at

10    724 (9th Cir. 1985) (quoting Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., 486 F.

11    Supp. 414, 429 (S.D.N.Y. 1980); see also 2 J. McCarthy, supra at § 30:18; Apple Computer, Inc.,

12    725 F.2d 521, 526 (9th Cir. 1984). Here, irreparable injury can be reasonably presumed after a

13    trademark owner seeking preliminary relief has demonstrated a likelihood of success on the issue

14    of infringement. Having proved a likelihood of confusion sufficient to support a preliminary

15    injunction, Plaintiff is entitled to a presumption of irreparable harm. Anheuser-Busch, Inc. v.

16    Customer Co., Inc., 947 F.Supp. 422 (N.D. Cal., 1996) (Illston, J.); Sardi's, 755 F.2d at 724.

17    Indeed, "common sense and various authorities suggest that any infringement or confusion must

18    pose a threat to the business, profits or reputation of the plaintiff in order to create a possibility of

19    irreparable harm." Sardi's Rest. Corp., 775 F.2d at 724; see also, e.g., McCarthy, supra at §

20    30:18 ("some courts find sufficient irreparable injury to grant a preliminary injunction in a

21    trademark case when plaintiff shows that, pending trial, it will lose control of its reputation

22    because it rests upon the quality of defendant's activities as a result of a likelihood of confusion

23    of purchasers"); Apple Computer, 725 F.2d at 526 ("once Apple demonstrated a likelihood of

24    success on the merits [because of likelihood of confusion] . . . the district court could have

25    reasonably concluded that continuing infringement would result in loss of control over Apple's

26    reputation and loss of goodwill"); Playboy Enterprises, 486 F. Supp. at 432 ("in determining

27    plaintiff's possible harm, the crucial question is not how different the magazines may be but

28    whether there is a danger that plaintiff may lose control of its reputation as a result of

1    confusion").''

2          Here, Blue will likely lose control over her reputation if a preliminary injunction is not

3    issued against Woffinden's infringing use of Blue's mark. Blue has developed a reputation as a

4    well-known and respected personality in the field of technology, robotics, human sexuality,

5    sexual health, and education since 1999. [FAC at 4:19-24]. Further, Blue is a prolific blogger,

6    sexual health commentator, podcaster, editor, newspaper columnist, and public speaker, whose

7    work has been recognized by or featured in the *Wall Street Journal*, SFGate.com (the website of

8    the *San Francisco Chronicle* newspaper), and *Forbes* magazine, among other forms of media and

9    educational material. *See supra* at II.A.1]. Throughout her career, Blue's writings, publications,

10    programs, speaking engagements, and educational initiatives have been associated with her

11    personal name and registered mark, VIOLET BLUE. [FAC at 6:7-11]. Failing to issue a

12    preliminary injunction to arrest Woffinden's use of Blue's mark to promote her pornography-

13    related acting, merchandise, advertisements, and live appearances has and will likely continue to

14    cause consumers to mistaken Blue with a pornographic actress. Blue will continue to suffer

15    irreparable harm to her business, profits, and professional reputation, if Woffinden persists in

16    using Blue's personal name and registered mark for the commercial purpose of promoting

17    Woffinden's pornographic career. Therefore, because there have been actual instances in which

18    consumers, and even acquaintances of both Blue and Woffinden, have become confused by

19    Woffinden's use of Blue's personal name and mark, Blue has established evidence of confusion.

20    This record of confusion shows confusion is not merely likely, it is certain, consistent, and

21    ongoing. This confusion will certainly lead to irreparable injury, as it has already begun to do,

22    unless Plaintiff's Motion is granted in this case.

23    **D.  THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF AND THE PUBLIC**
24        **INTEREST IS SERVED BY A PRELIMINARY INJUNCTION.**

25          Although Plaintiff has already met its burden for a preliminary injunction, *see* <u>Los</u>

26    <u>Angeles Memorial</u>, 634 F.2d at 1201, Plaintiff also easily meets the addition tests for the

27    traditional equitable criteria for granting preliminary injunctive relief.

28          The balance of hardships in this case tips in favor of Plaintiff. There is little hardship in

1  Defendant's changing her name as a porn actress. Defendant can change, and in fact has changed,

2  her stage name whenever she so chooses. She has done so twice, in fact, during the pendency of

3  this very litigation. *Supra* at II.A.2. Plaintiff, on the contrary, has already been harmed by the

4  growing false-association between herself and Defendant in an increasing segment of the

5  population. This sort of damage to her reputation is, by its very nature, permanent.  Because

6  Plaintiff stands a high likelihood of suffering irreparable damage, the balance of hardships in this

7  case must tip heavily in favor of Plaintiff.

8      Finally, the public interested is served by the issuance of a preliminary injunction in this

9  case. Trademark law is intended to protect the consuming public from being misled or deceived

10  by similarly marked goods and services they encounter in the marketplace.  In the course of

11  preventing others from copying a source-identifying mark, trademark law thus helps to "reduce

12  the customer's costs of shopping and making purchasing decisions," Qualitex Co. v. Jacobson

13  Prods. Co., 514 U.S. 159, 163-64 (1995). Here, in addition to the numerous instances of actual

14  confusion admitted to by Woffinden, confusion among consumers is likely to result from

15  Woffinden's use of the VIOLET BLUE mark.  In light of Woffinden's intended and actual use of

16  the VIOLET BLUE mark within Blue's Northern California location as well as across the globe,

17  though her use of the internet as a marketing channel, the likelihood of consumer confusion and

18  irreparable harm is even greater. Accordingly, issuance of a preliminary injunction will serve the

19  public interest by preventing such confusion.

20              **IV.  CONCLUSION**

21      For the foregoing reasons, Plaintiff Violet Blue respectfully requests that this Court grant

22  this motion for preliminary injunction, enter the accompanying proposed preliminary injunctive

23  order, and grant Blue any such further relief as this Court deems necessary and proper.

24      Dated:  April 3, 2008

25                          VOGELE & ASSOCIATES

26

27                  By:____/S/_____
                            Colette Vogele
28                    Attorneys for Plaintiff VIOLET BLUE