COLETTE VOGELE (SBN No. 192865)
Email: colette@vogelelaw.com
BENJAMIN COSTA (SBN No. 245953)
Email: ben@vogelelaw.com
**VOGELE & ASSOCIATES**
12 Geary Street, Suite 701
San Francisco, CA 94108
Tel: (415) 751-5737
Fax: (415) 358-4975

Attorneys for Plaintiff and Counter-defendant
VIOLET BLUE

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VIOLET BLUE, an Individual,<br><br>    Plaintiff and Counter-defendant,<br><br>    v.<br><br>ADA MAE JOHNSON a/k/a ADA WOFFINDEN, an individual d/b/a VIOLET BLUE a/k/a VIOLET a/k/a VIOLET LUST; et al.,<br><br>    Defendants and Counter-claimants. | Case No. C 07-5370 SI<br><br>**PLAINTIFF VIOLET BLUE'S REPLY IN SUPPORT OF HER MOTION FOR PRELIMINARY INJUNCTION**<br><br>The Honorable Susan Illston<br>Courtroom 10, 19th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Hearing Date: May 9, 2008<br>Hearing Time: 9:00 a.m. |

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................. 1

II. ARGUMENT .................................................................................................... 3

    A.    THE STATUTORY PRESUMPTION IS NOT REBUTTED ................... 3

        1.    Blue has a valid trademark registration and the mark is inherently distinctive. ................................................................................ 3

        2.    Woffinden's Purported "Evidence" Falls Short Of Rebutting Blue's Presumption. ................................................................. 4

    B.    BLUE HAS ESTABLISHED A STRONG LIKLIHOOD OF CONFUSION RESULTING FROM WOFFINDEN'S INFRINGING USE. ............................................................................................................ 7

        1.    Strength Of The Mark. ....................................................................... 7

        2.    Relatedness Of The Goods. ............................................................... 7

        3.    Evidence Of Actual Confusion. ......................................................... 8

        4.    Marketing Channels Used. ............................................................... 10

        5.    Type Of Goods And Care Likely To Be Exercised By The Purchaser. ........................................................................................ 11

        6.    Defendant's Intent In Selecting The Mark. .................................... 12

        7.    Likelihood Of Expansion Of The Product Lines. ........................... 12

    C.    BLUE IS LIKEY TO SUCCEED ON THE MERITS OF HER DILUTION CLAIM. .................................................................................. 13

    D.    BLUE IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIM THAT WOFFINDEN'S UNAUTHORIZED USE OF PLAINTIFF BLUE'S NAME AND LIKENESS VIOLATES CAL. CIV. CODE § 3344. ............................................................................................................ 14

    E.    BLUE WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT ISSUED. ............................................................................................. 15

III. CONCLUSION ............................................................................................... 16

## I. INTRODUCTION

There is no dispute that a conflict exists between Plaintiff Blue's use of her trademark, VIOLET BLUE, and Woffinden's use of the "stage name" Violet Blue. It is also undisputed that trademark law must intervene to resolve this conflict. The touchstone of trademark law is to protect consumers from confusion. Consumers are plainly being confused by the identical use of two identical names by two women in near-identical markets. This confusion and the risks associated with it are particularly likely since both of these individuals use the Internet as their primary marketing channel. Thus, in order to avoid the confusion, protect the public, and fulfill the purposes and aspirations of trademark law, one of the two women simply must stop using the name. The only question in this case is which party must stop. Here, it is clear that the junior user, Woffinden, is the party who must stop.

First, Blue was first to use the mark VIOLET BLUE as a brand. Blue's federal trademark registration establishes the presumption that her use began at least as early as May 1999. The declarations of third parties Dr. Carol Queen, Darren McKeeman, Thomas Roche, in addition to the declaration of Violet Blue herself, provide uncontroverted support for the fact that Blue began using her mark for providing "on-line publications" (as stated in her trademark registration) when she wrote her first column for Gothic.net. Woffinden, for her part, has neither contradicted this date of use, nor asserted herself as the senior user of the VIOLET BLUE mark.

Second, as discussed below in section II.A., the mark VIOLET BLUE is inherently distinctive. As such, there is no need, as Woffinden speciously argues, that Blue show "secondary meaning," or acquired distinctiveness, of her brand.

Third, the Trademark Office issued Blue a trademark registration for the VIOLET BLUE trademark for use with the precise goods and services central to this case – namely, goods and services "in the fields of health… sexual pleasures, pornography, [and] technology…" Decl. of B. Costa ISO Plf.'s Mot. for Prelim. Inj. ("Costa Decl."), Exh V. The close proximity of these goods and the channels in which these goods are marketed elevates the likelihood of confusion beyond mere likelihood to a level of certainty.

Fourth, Woffinden is the late-comer, encroaching into the market for Blue's brand.

1  Woffinden adopted the "stage name" Violet Blue for her hard core, pornographic performances
2  well after Plaintiff Blue had established herself – and her unique *brand* of writing, educating, and
3  appearances - in the marketplace of two converging fields: sex-related education and the adult
4  industry on the one hand, and technology and robotics/machine art on the other. *See* Queen Decl.,
5  ¶ 6. Indeed, from at least as early as 1996, Blue consistently used her brand to (a) distinguish her
6  high-quality services as a tech expert and machine artist, and later as a writer, speaker, educator,
7  and advocate in the sex-positive culture and (b) to endorse products, people, companies, and the
8  like who encourage a sex-positive[1] culture.

9  After Woffinden entered the adult industry, she used several different names throughout
10 her career. She had not adopted any consistent "stage name" until possibly sometime in 2002.
11 Importantly, she claims to have adopted the "Violet Blue" stage name many critical months -- if
12 not years -- *after* Blue was established in the industry, writing and publishing erotica and sexual
13 information. *See e.g.,* Roche Decl., ¶5-6, McKeeman Decl., ¶5-7, Blue Decl., ¶11. Woffinden
14 offers no credible evidence of having an earlier date of first use than Blue.

15 She also declares that she has given model releases to producers of porn films to use *her*
16 *own* "name and likeness", but that is not the issue here. If producers of pornographic films want
17 to use *her name* – e.g., Ada Mae Johnson or Ada Woffinden – that is fine. If they want to use *her*
18 *likeness* that is fine too. What the law does not permit is Woffinden's use of, and granting
19 permission for others to make use of, *Blue's* brand VIOLET BLUE, *Blue's* personal name, and
20 *Blue's* name together with her likeness, on goods and services "in the fields of health… sexual
21 pleasures, pornography, [and] technology". Costa Decl., Exh. V.

22 In her Opposition Brief ("Opp."), Woffinden concedes as much.  She concedes that Blue
23 has a valid federal trademark registration. She concedes that this valid registration presumptively
24 gives Blue the exclusive right to use the VIOLET BLUE mark nationwide. She also concedes that
25 her use of her stage name "Violet Blue" is identical to Blue's registered mark, and that this has
26 caused confusion, even among her fellow coworkers in the adult industry. She even concedes that

---

[1] "Sex-positive" generally deals with promoting and providing access to frank and truthful information regarding safer sex guidelines, sexual health and sexual safety, including emotional sexual safety.

Blue was the first to use the name in commerce in this country. After this series of concessions and without acknowledging the ongoing harm she causes to consumers, Woffinden attempts to evade injunctive relief by purporting to put forth evidence and argument that her junior use of the VIOLET BLUE mark is somehow saved because she established her use within a few years of Blue and before Blue's federal registration issued. Yet this is not the law. *See generally*, McCarthy on Trademarks, § 16:4 (trademark rights begin with first use, not with registration). Nor has Woffinden actually established her alleged earlier use through trustworthy, corroborative evidence. Her only evidence to support even this weak assertion is her own self-serving declaration. She has no documentation, no third-party declarations, and no *prima facie* presumptions to rely upon. All Defendant has are her own words, which she concedes now directly conflict with her prior admissions in this case.

Thus, in light of Plaintiff Blue's proper registration, the supporting evidence, her prior use, and Defendant's failure to provide any credible admissible evidence in rebuttal, this Court should enforce Blue's trademark rights to ensure that consumers are no longer confused by Defendant's identical use of the name "Violet Blue" in her markets. As such, this Court and equity itself must intervene to protect the superior and undisputedly senior rights of Blue by granting this preliminary injunction.

## II.  ARGUMENT

### A.  THE STATUTORY PRESUMPTION IS NOT REBUTTED.

1.  Blue has a valid trademark registration and the mark is inherently distinctive.

Registration by the PTO without proof of secondary meaning creates the presumption that the mark in question is inherently distinctive. PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 563 (2d Cir. 1990); Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 17 (2d Cir. 1976). As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of the mark's protectibility by a preponderance of the evidence. *See* id. Here, Blue is entitled to presumption that her mark is inherently distinctive, and *not* merely descriptive because during the prosecution of the VIOLET BLUE trademark application, the Examiner never raised the issue of "descriptiveness" at all. [Decl. of C. Vogele

ISO Plf's Mot. for Prelim. Inj. ("Vogele Decl."), Exhs. B, C]. This makes sense because the two-word combination of "Violet" with "Blue" is not, as such, a surname. Nor is the VIOLET BLUE a brand that the public would perceive as "primarily merely a surname" within the meaning of the Trademark Act. 15 U.S.C. § 1052(e)(4). Thus, the fact that the brand VIOLET BLUE is also the personal name of the trademark owner is a non-issue from the standpoint of the distinctiveness of the mark. Woffinden cannot overcome this fact, and this presumption favoring Blue, as she has provided no credible evidence.

While Woffinden cites McCarthy on Trademarks for the proposition that "Personal names are placed by the common law into that category of noninherently distinctive terms …," this argument misses the mark because this action involves Blue's assertion of a *statutory* right, not a common law right. Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986, 990 (7th Cir. 2004) (Posner, J.).[2] Under the Lanham Act will, there remains *no* presumption that surnames are unregisterable absent a showing of secondary meaning. 15 U.S.C. § 1052(e)(4). Rather, the Lanham Act requires that secondary meaning be shown *only* for marks that are "primarily merely surnames." Id. §1052. The Trademark Manual of Examining Procedures expressly addresses the question of "primarily merely a surname" marks and supports a finding that here, the mark is simply not "primarily merely a surname." T.M.E.P. § 1211.01; In re Joint-Stock Company "Baik", 84 USPQ2d 1921 (TTAB 2007). Because VIOLET BLUE is not primarily merely a surname, the VIOLET BLUE trademark is registrable, inherently distinctive, and enforceable, and does not require a showing of secondary meaning.

2.     Woffinden's Purported "Evidence" Falls Short Of Rebutting Blue's Presumption.

Woffinden has not rebutted the important presumption regarding distinctiveness. The "evidence" she offers consists of her own self-serving declaration which contains no

---

[2] "The personal-name 'rule,' it is worth noting, is a common law rather than statutory doctrine. All that the Lanham Act says about personal names is that a mark that is 'primarily merely a surname' is not registrable in the absence of secondary meaning. 15 U.S.C. §§ 1052(e)(4), (f). There is no reference to first names ... The extension of the rule to first names is a judicial innovation and so needn't be pressed further than its rationale, as might have to be done if the rule were codified in inflexible statutory language. Notice too the limitation implicit in the term "primarily." Id. *See also* McCarthy on Trademarks, §13.2

1  corroborative documents or third party support. It should therefore be rejected for many reasons.

2  First, under long-standing Supreme Court precedent, courts plainly recognize that self-serving, first person declarations inherently lack persuasiveness. Dist. Of Columbia v. Murphy, 314 U.S. 441, 456 (1941) ("One's testimony with regard to his intention… is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts."); *see also* Korn v. Korn, 398 F.2d 689, 691 n.4 (3d Cir. 1968). This notion that self-serving declarations are not trustworthy, and in some cases inadmissible, has been broadly recognized by the Ninth Circuit. Shreve v. United States, 103 F.2d 796, 806 (9th 1939.) ("Declarations of a party in his own behalf … are said to be self serving."). Boyd v. City of Oakland, 458 F. Supp. 2d 1015, 1038 (9th Cir. 2006) ("The 'circumstantial guarantees of trustworthiness' required by Rule 807 are not present where the statement of the declarant is 'plainly self-serving and no corroboration [is] available.'" (citing Bulthuis v. Rexall Corp., 789 F.2d 1315, 1316 (9th Cir. 1985). Here, Woffinden's declaration fails to offer even a shred of independent support of her self-serving statements.

Moreover, the statements in her declaration as to the date of first use are hearsay. She offers the statements for the truth of what is contained in a film she *thinks* she acted in nearly seven years ago under the name "Violet Blue". The hearsay rules, however, prohibit just this sort of assertion. Fed. R. Evid. 801, *et.seq*. The statement regarding her alleged first performance also runs afoul of the best evidence rule. The statement attempts to prove the contents of *a recording* (the Simon Wolf Beauty and the Bitch 2 video), but the rules of evidence require that if she wants "to prove the contents of [that]… recording" she must provide "the original". Fed. R. Evid. 1002. No such original has been provided to this Court.

Second, the declaration offered by Woffinden is riddled with contradictions that further undercut trustworthiness. To date, Woffinden has asserted at least four inconsistent timeframes in which she allegedly first started using the stage name "Violet Blue." She alleges some dates around December 2000. [*See* Initial Answer at 3:16-17 (alleging started using Violet Blue as a stage name "since before December 20, 2000."); id. at 8:13-13 (first use began "before December 2000.")]. But she also asserts first use dates around February or March 2000. [*See* Answer to FAC

1  2:4-5 (alleging used the name "almost 8 years ago," which translates to sometime after February
2  4, 2000); id. at 2:20-21 and 23:21-22 ("on or around March 2000"); Def's Response In Opp. to
3  Plf's Mot. to Strike Fifth Counterclaim and Mot. to Dismiss 3rd and 4th Counterclaims ("at least
4  the past eight years" which is sometime before March 14, 2000).] And her opposition also states
5  "7 years ago" which translates to April 2001. Opp. at 23:21 and 23:27. In one pleading, and in her
6  initial disclosures under Rule 26(a), she even claims a first use "since as early as July 1999" in a
7  production called SMUT 14. [Answer to FAC at 2:7-9; *see also* Defendant's Initial Disclosures at
8  2:8-9.] She provides no corroborating evidence of her alleged dates of first use and, in fact, the
9  earliest "first use" date (regarding the SMUT 14 film) appears patently false. Woffinden does not
10 in fact appear in that film. [*See* Vogele Decl., ¶ 5 & Exh. D.] Instead, it is a Latina performer
11 who performs under the name "Violet." [Id.]

12    Another source of inconsistencies is Defendant's assertion as to the number of films in
13 which she has appeared. For example, Defendant alleged that she has appeared in no fewer than
14 300 productions, using her maiden name, or more commonly, openly, and notoriously using her
15 stage name "Violet Blue." [*See* Answer to FAC at 2:25-26, 3:1, 4:14-15]. However, Woffinden
16 then asserts in her Initial Disclosures that the Internet Movie Database shows but 165 movies in
17 which Defendant appeared under her stage name and real name combined. [Vogele Decl., Exh. A
18 at 4:16-19]. This is not an insignificant difference in quantity of films allegedly produced.[3]

19    Third, Woffinden has repeatedly broken her word regarding her future plans for use of the
20 name "Violet Blue." For example, she claims the she has never used the "'Violet Blue' stage
21 name to provide sexual information or education in the areas of technology or geek culture [and
22 has] no plans to do so," Woffinden Decl. at 3:9-10, she has nevertheless appeared in two films
23 released this year, "Nina Hartley's Guide To Great Sex During Pregnancy," and "Kick Ass Chicks
24 50: Nerdy Girls," which plainly broach the topics of, in the one case, sexual education, and, in the
25 other, technology and geek culture. [See Vogele Decl., ¶ 6 & Exh. E; Costa Decl., Exh. T].

26    Finally, Blue has provided ample proof of prior use of the mark. *See* Declarations of C.

---

27 [3] Woffinden should also not be trusted in general because she has shown low regard for truth or
   honesty in her business affairs. For example, when she registered her website domain
28 (www.violetblue.org) with a domain name registrar, she falsely named a company "Violet Blue
   Inc." as the "registrant" of that website. *See* Declaration of J. Tanner at 2:14-16 & Exh. A.

1  Queen, D. McKeenan, T. Roache, V. Blue and related documentary support contained therein.

2  In short, the self-serving and unsupported declaration of Woffinden, cannot form the required

3  preponderance of the evidence to overcome the presumption of the validity, distinctiveness, and

4  dates of first use of Blue's federally registered and protected VIOLET BLUE trademark, so

5  clearly established by Blue's evidence.

6  **B.    BLUE HAS ESTABLISHED A STRONG LIKLIHOOD OF CONFUSION
        RESULTING FROM WOFFINDEN'S INFRINGING USE.**
7

8  Because the AMF factors in this case overwhelmingly favor Blue, she has demonstrated a

9  likelihood of confusion and therefore ample grounds for a preliminary injunction. We note that

10 Woffinden concedes the identity of the marks being exactly the same, so that factor is no longer

11 in issue and weighs heavily in favor of Plaintiff Blue.

12      1.    Strength Of The Mark.

13 The parties' only dispute regarding this fact is whether Plaintiff Blue's mark is distinctive.

14 As discussed above, Woffinden's argument that Blue's mark is "considered descriptive because it

15 is a personal name" is incorrect and should be rejected by this Court.[4] For the many reasons

16 detailed above, *see* supra II.A. Blue's VIOLET BLUE trademark is inherently distinctive and

17 therefore strong. As such, this factor must favor Blue.

18      2.    Relatedness Of The Goods.

19 Blue does not dispute that she maintains a very different attitude and practice that is

20 associated with the good will of her brand from that of Woffinden's hard-core pornography acting

21 and appearances. Nevertheless, under Brookfield, the goods and services are highly related and

22 substantially identical. First, it is undisputed that Blue is the registered owner of the VIOLET

23 BLUE trademark for goods and services in, among others, the fields of "sexual pleasures," and

24 "pornography." Woffinden uses her stage name "Violet Blue" for goods and services in the

25 hardcore pornographic industry. *See* Decl. Woffinden ISO Response In Opp. To Plf's Mot. for

26 Prelim. Inj. ("Woffinden Decl."). Given the identical nature of the goods recited in the VIOLET

---

27 [4] Even assuming, for the sake of argument, that Blue's mark is "descriptive," Blue provides the declarations of Dr. Carol Queen, Darren McKeeman, Thomas Roche, and her own declaration
28 supported by exhibits, to establish that she had certainly attained secondary meaning by the time Woffinden adopted the mark.

1  BLUE trademark registration and Woffinden's use as a pornography and sex performer, this
2  factor must weigh heavily in favor of Blue.

3       Second, to the extent that there is any difference, such minor differences have routinely
4  been held *de minimis*, and nevertheless resulted in this factor of the *AMF* analysis tipping in favor
5  of the senior user.  *See* Brookfield v. W. Coast Entm't Corp., 174 F.3d 1036, (9th Cir. Cal. 1999)
6  (Rental and sales of movies are sufficiently related to information about movies); Dreamwerks
7  Prod. Group v. SKG Studio, 142 F.3d 1127 (9th Cir. 1998) (movies are sufficiently related to sci-
8  fi merchandise); AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) (high-speed
9  waterskiing racing boats are sufficiently related to family-oriented recreational boats);
10  Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 153-55 (9th Cir. 1963) (beer
11  sufficiently related to whiskey). The use of identical marks to offer similar, and at least partially
12  identical, products must weigh heavily in favor of likelihood of confusion. See AMF, 599 F.2d at
13  348. As such, the factor considering the relatedness of the goods must favor Blue.

14       3.    Evidence Of Actual Confusion.[5]

15       Courts have consistently held that actual confusion is the best evidence of likelihood of
16  confusion. See, e.g., Exxon Corp. v. Texas Motor Exchange, Inc., 628 F.2d 500, 506 (5th Cir.
17  1975); *see also* Sardi's Rest. Corp. v. Sardie, 755 F.2d 719, 724 (9th Cir. 1985); Online

---

[5] Regarding this factor, relying on *Bullen*, Woffinden argues that discussion of her Initial Answer is inappropriate and should be ignored by the Court. [Opp. at 15:22-26]. The Court may *not* ignore the Initial Answer. The Initial Answer is a pleading in this Court's record, and has been neither amended nor stricken from that record. *See* Fed. R. Civ. P. 12(f), 15(a). Woffinden's reliance on *Bullen* for the uncontroversial proposition that "[i]t is hornbook law that an amended pleading supersedes the original" is irrelevant. Bullen v. De Bretteville, 239 F.2d 824, 833 (9th Cir. 1956). Here, the record contains *no amended answer* by Woffinden. Instead, the record contains two entirely separate and distinct documents both placed into the record by Woffinden: (i) an Answer to the original Complaint and (ii) an Answer to Blue's First Amended Complaint. Though Blue's original Complaint is superseded by her FAC, Woffinden's Answer to the FAC is not itself an amendment to the Initial Answer, but rather a responsive pleading to Blue's FAC.
     Moreover, though Woffinden has retained counsel between the time she filed her Initial Answer and the time she filed of her Answer to the FAC, her initial *pro se* status cannot be used to shield her from the factual admissions she makes in her Initial Answer. "Pro se litigants must follow the same rules of procedure that govern other litigants. King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987); *see also* United States v. Merrill, 746 F.2d 458, 465 (9th Cir. 1984), Briones v. Riviera Hotel & Casino, 116 F.3d 379, (9th Cir. 1997). This principle is doubly applicable to the instant matter because Woffinden does not seek to diminish the relevance of her Initial Answer to account for her failure to understand the law or legal pleading requirements. Rather, the statements she seeks to diminish are plain and simple statements of facts of which she – not her lawyer -- possessed personal knowledge. Neither Woffinden nor her counsel can relegate these statements to "non-existence" simply because counsel understands more keenly than client just how damaging these admissions are.

1  Partners.com, Inc. v. Atlanticnet Media Corp., 2000 U.S. Dist. LEXIS 783, 19-20 (N.D. Cal. Jan.

2  18, 2000) (Illston, J.). Under the much-relied-upon AMF standard, evidence of actual confusion is

3  persuasive proof of future confusion. AMF, 599 F.2d at 352; *see also* Thane Int'l Inc. v. Trek

4  Bicycle Corp., 305 F.3d 894, 902 (9th Cir. 2002).  Accordingly, the several instances of actual

5  confusion cited by Blue, [*see* Plaintiff Blue's Mot. for PI at 14:23-15:8 (citing instances of

6  confusion in the record); Declaration of J. Juul, ¶2-4; Blue Decl. ¶¶ 20-22], underscore the *strong*

7  likelihood that confusion will occur in the future if Woffinden's use of Blue's brand, VIOLET

8  BLUE, is not enjoined. Most importantly, Woffinden herself plainly admits that numerous

9  instances of actual confusion exist.  *See* DKT66 14:28-15:8.

10        Even assuming, *arguendo*, that the amount of actual confusion in this case is small,

11  Woffinden has failed to produce any reliable authority, and not a single case decided after the

12  seminal *AMF* decision, to support the proposition that multiple instances of actual confusion

13  should not weigh in favor of Blue. Importantly, this case is nothing like *McGraw-Hill*, offered by

14  Woffinden, because that case involved a single instance of a person who was confused by a

15  magazine subscription.  McGraw-Hill v. Am. Aviation Assoc, 73 App. D.C. 131 (D.C. Cir.

16  1940). Neither is this a case like *Everest & Jennings* in which "mere occasional misdirected mail"

17  was persuasive to prove a likelihood of confusion. *See* Everest & Jennings, Inc. v. E & J Mfg.

18  Co., 263 F.2d 254, 260 (9th Cir. Cal. 1958). Nor is this case, like *De Costa*, concerned with a

19  Plaintiff whose enterprise was small and localized while the defendant's enterprise was

20  nationwide. DeCosta v. Columbia Broad. Sys., Inc., 520 F.2d 499, 514 (1st Cir. 1975). Rather

21  under a proper analysis, actual confusion is merely one factor of the *AMF* formulation, and one

22  which must weigh in favor of Blue.[6]

---

26  [6] In regards to this factor, Woffinden has also raised the specter of hearsay.  Opp. at 14:16. She has produced no authority on which to base the concern that the specific and concrete instances of clear confusion run afoul of the hearsay rules. Many authorities hold that the kind of evidence

27  presented by Blue is admissible for these purposes. See Conversive, Inc. v. Conversagent, Inc., 433 F. Supp. 2d 1079, 1091 (C.D. Cal. 2006) (granting motion for preliminary injunction in

28  trademark action) (comparing Eighth Circuit case rejecting "vague evidence of misdirected phone calls and mail" with several other Circuit courts allowing such evidence to show state of mind).

In short, nothing offered by Woffinden contradicts the wisdom that "[e]vidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." AMF, 599 F.2d at 350 citing Plough, Inc. v. Kreis Laboratories, 314 F.2d 635 (9th Cir. 1963). Because evidence of actual confusion in any trademark infringement case is so rare, "this factor is weighed heavily … when there is evidence of past confusion." AMF, 599 F.2d at 353. As such, the availability of evidence of actual confusion here – including the *admissions* of Woffinden herself – must tip this factor "heavily" in favor of Blue. Id.

4.  Marketing Channels Used.

It is undisputed that both parties market, sell, and distribute their goods through an identical channel: the Internet. Woffinden's Respo. In Opp To Plfs Mot For Prelim. Inj. ("Opp.") 16:14-15. In fact, this method of distribution and advertising predominates the sales efforts of both Blue and Woffinden. Moreover, both parties agree that their products are largely Internet-based. For example, Blue provides the bulk of her writings via the Internet and all VIOLET BLUE-branded published works are available for sale online. Woffinden similarly distributes pictures and video through her own website, and those websites owned by her various affiliates, including her most recent works published this year "Nina Hartley's Guide To Great Sex During Pregnancy,"[7] and "Kick Ass Chicks 50: Nerdy Girls."[8] Finally, even outside the confines of the Internet as a marketing channel, it is clear that both Blue and Woffinden's marketing overlap in other ways: each make "personal appearances" to promote, advertise, and market their work.

The "Web, *as a marketing channel*, is particularly susceptible to a likelihood of confusion

---

Simply put, the evidence offered by Blue is not hearsay. First, Woffinden's admissions against interest do not run afoul of the hearsay rule because they are accepted under Fed. R. Evid. 803(3). Second, the e-mail received by Blue from an intimate acquaintance of Woffinden is not offered for its truth, it is offered to show Dave Pounder's state of mind (that he was confused who he was sending the message to). Conversive, 433 F.Supp.2d at 1091 (citing cases). Third, the statements in Blue's October 27, 2007 blog post are now corroborated and offered under the sworn declaration of Justin Juul, one of the parties who was confused. [Juul Decl., ¶ 4.] These statements from Mr. Juul's personal knowledge are offered to show his state of mind. Fed. R. Evid. 803(3). Fourth, the Court may take judicial notice of the news articles offered to show actual confusion. [See Costa Decl., Exh. I Blue Decl., Exh. I.] Fed. R. Evid. 201(b)(2); Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1117, 1109 (N.D. Cal. 2003). The contents are merely offered to show the state of mind of the public media who actually confused Blue and Woffinden. Fed. R. Evid. 803(3). Accordingly, Woffinden's hearsay arguments must be rejected.

[7] available at http://www.cduniverse.com/productinfo.asp?PID=7657522&style=ice&frm=frooglemovieA&siteid=114&cart=711437690

[8] available at http://www.action-dvd.com/info.asp?userid=6E9F9036-036C-4F2D-A6B6-8517B65A18CB&product_id=STDV35910&tab=2#S

since … it allows for competing marks to be encountered at the same time, on the same screen." GoTo.com, Id. at 1207 (*emphasis added*). Much like the plaintiff and defendant in GoTo.com, Blue and Woffinden both use the Internet and their websites as the primary marketing channel for their goods. Where both parties use the Internet as a marketing channel, this factor must favor the senior user, Blue. Brookfield, 174 F.3d at 1057. Moreover, when the Internet as a marketing channel predominates, as is the case here, the parties both furnish online products, and their other methods of promotion also overlap, this conclusion is further reinforced. *See* Entrepreneur Media v. Smith, 279 F.3d 1135, 1151 (9th Cir. Cal. 2002). Woffinden has produced no authority disputing this conclusion. As such, this factor must also heavily favor Blue.

        5.       Type Of Goods And Care Likely To Be Exercised By The Purchaser.

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." AMF, 599 F.2d at 353; see also HMH Publishing Co. v. Lambert, 482 F.2d 595, 599 n. 6 (CA 9 1973). As the price of a good increases, the typical buyer will naturally exercise a high degree of caution. Id. The relatively low cost of Blues' and Woffinden's goods and services in this case, and the accompanying low degree of consumer care likely to be exercised, must tip this factor heavily in favor of Blue. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 53 U.S.P.Q.2d 1652 (9th Cir. 2000). In GoTo.com, the Ninth Circuit found that the "glaringly similar" nature of the plaintiff's website logo and the defendant's web portal logo made it likely that consumers would be confused. The Court noted that, "[n]avigating amongst web sites involves practically no effort whatsoever, and arguments that Web users exercise a great deal of care before clicking on hyperlinks are unconvincing." *Accord*, AMF, 599 F.2d at 353. Here, both Blue and Woffinden's goods are accessed by consumers via the Internet, such that there is a strong likelihood that non-discerning consumers will become confused. Also, because of the low costs of the goods offered by both parties, this factor must also favor Blue.[9]

---

[9] Woffinden's attempts to differentiate the goods and services in arguing this factor, simply has no bearing on the degree of care consumers will exercise when purchasing the goods of either. Blue has addressed the relatedness of the goods above, in the section dealing with the relatedness of the goods.

6. Defendant's Intent In Selecting The Mark.

At this early stage in the case, before discovery has been developed, there is little opportunity for Blue to provide direct evidence regarding Woffinden's intent when originally selecting "Violet Blue" to be her stage name. Nevertheless, the relevant point is that Woffinden has used at least three names while performing as a hardcore porn actress. Recently, she even changed her name to Violetta Blue after this case was commenced, and then *readopted* the name Violet Blue, with full knowledge of Blue's obvious concerns about the name. Woffinden's argument that her attempt to change her name "failed" because the new name "simply did not 'take' in the industry" defies logic. Woffinden made an unequivocal public announcement in a popular on-line industry forum, [Costa Decl. M (Adult Industry News, 11/3/07)], but apparently made *no other effort* to change her name. Her declaration offers no other facts to support what she presumably did to advertise her new name. She continued to host her website through Assassin Pictures, and the site remained unchanged. Then, at some point around the time she hired her lawyer she changed it back to Violet. No wonder her attempt "failed", she gave it less than a month and made no true effort. In any event, this factor should weigh in Blue's favor, or at minimum be a neutral factor given that Woffinden provides no evidence.

7. Likelihood Of Expansion Of The Product Lines.

The likelihood of expansion of the product lines is a foregone conclusion. The product lines have already overlapped. As noted *supra*, Woffinden's use is in the porn industry and Blue is the registered owner of the VIOLET BLUE trademark for use in fields of "sexual pleasures," and "pornography." The identical nature of the goods (e.g., pornography) means that no expansion is necessary for the goods to overlap. As such, this factor must tip in favor of Blue.

Disputing the identically of the goods, Woffinden argues that this factor favors her because she "has no plans to enter the arenas of sexual information and education, technology, or geek culture utilizing the name Violet Blue." Opp. 18:25-26; Woffinden Decl. ¶18. She also argues that this factor favors Woffinden because she "has no control over how the copyright holder uses works in which she has performed." Opp. 19:3-4; Woffinden Decl. at ¶ 22. Opp. 14-80:6. These unsubstantiated and self-serving statements should be rejected as noted above, *supra*

II.A.2. As noted in Blue's opening brief, Woffinden has already expanded her range as a porn actress into themes related to technology and geek culture. *See* Blue's Motion at 6:23-7:4 and 17:17-26 (Nerdy Girl production and Guide to Pregnant Sex). Obviously, Woffinden's alleged "plans" to avoid the fields of special expertise occupied by Blue are anything but genuine.

In sum, for all these reasons, Blue has established a likelihood of success on the merits for her claims of trademark infringement and unfair competition.

### C.   BLUE IS LIKEY TO SUCCEED ON THE MERITS OF HER DILUTION CLAIM.

Plaintiff Blue is likely to succeed on her claim of dilution under 25 U.S.C. 1125(c)(1). The crux of Woffinden's argument against this proposal seems to rest on two points both of which can be easily dismissed. First, citing not a single case to support her position, Woffinden cavalierly takes aim at Blue's evidence by arguing that a website with 4 million unique monthly visitors is "unimpressive", and that recognition by leading news organizations like the Wall Street Journal and Forbes Magazine do not provide the level of recognition necessary to be famous. Under Woffinden's view, only the likes of "Stephen King, John Grisham, and J.K. Rowling" could succeed on a dilution claim. Woffinden Opp. at 21:4-5. Blue's fame, however, is clearly supported by her series of accomplishments and recognition recited in the opening brief, including her authorship of 17 books that have been distributed world wide. Book publishers are not in the habit of offering multi-book deals to authors whose literary skill and renown is insufficient to sell them. [*See* Queen Decl., ¶8.] To the extent that the Court is inclined to consider Woffinden's bare assertions, Blue submits further evidence of her notoriety and fame – going back as early as the year 2000 when she was offered her first book deals. *See, e.g.,* Queen Decl., ¶ 8 (describing Blue's notoriety as a basis for her book deals), Roche Decl, ¶ 10 (explaining importance and broad popularity of webzines), and McKeeman Decl, ¶ 6-7. This evidence suffices to demonstrate the necessary "fame" required at this stage of the litigation and to show Blue's likelihood of success under the Federal Dilution Revision Act.

Second, contrary to Woffinden's argument, Opp. at 21:6, evidence of "actual confusion" is simply not a requirement to succeed on any claims under the Lanham Act, AMF, 599 F.2d 341,

352-3 (actual confusion not required to find trademark infringement), including a dilution claim under section 1125(c). Indeed, the Dilution Revision Act of 2006 was so enacted expressly to overrule Supreme Court precedent requiring evidence of "actual dilution" to succeed on a federal trademark dilution claim . Mosley v. V Secret Catalogue, 537 U.S. 418 (2003).

The clear weight of evidence favors recognition both of Blue's fame and of her achievement thereof well before the most recently claimed "date of adoption" by Woffinden. As such, Blue has demonstrated a likelihood of success on the merits of her claim of dilution.[10]

### D. BLUE IS LIKELY TO SUCCEED ON THE MERITS OF HER CLAIM THAT WOFFINDEN'S UNAUTHORIZED USE OF PLAINTIFF BLUE'S NAME AND LIKENESS VIOLATES CAL. CIV. CODE § 3344.

Woffinden and Blue agree that the plain language of the California Right of Publicity statute governs this claim. Woffinden argues that "to prevail on this claim Plaintiff Blue must show that Woffinden *adopted* the name Violet Blue *knowingly*." DKT 80 22:5-6 (emphasis added). Unfortunately for Woffinden, that is not what the statute states. Specifically, "the plain language the statute" reveals that knowing *use*, not knowing *adoption*, is the touchstone of a successful claim under §3344. The question under §3344, is not Woffinden's knowledge when she first used Blue's name. Rather, it is whether Woffinden, at any point, knowingly used Blue's name "on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent." Cal. Civ. Code § 3344(a). *Any* knowing use, even after her alleged "adoption"[11] of Blue's name, will constitute a violation of Cal. Civ. Code §3344.

Woffinden's reading of the statute, for which she provides no authority, would produce a curious result indeed. By tying the knowledge requirement to the date of the first time a person or entity used the name or likeness of an individual for commercial purposes, Woffinden in essence argues that a single use of Blue's name, before Woffinden's knowledge can be shown, would furnish Woffinden with a perpetual, worldwide, royalty-free license to use Blue's name, in

---

[10] As discussed above, *supra* II.A.1., Woffinden's arguments concerning a purported need to show secondary meaning can be rejected because Blue's mark is inherently distinctive.
[11] As noted, Woffinden has "adopted" numerous names over the years for her professional pursuits.

1  precisely the manner statutorily proscribed, forever. This is an extreme and perverse result, and
2  stands at odds with the both a plain reading and the very purpose of Cal. Civ. Code §3344.
3        The use by Woffinden of Blue's name, after Woffinden gained knowledge of Blue,
4  constitutes a violation of §3344. It is undisputed that Woffinden knew of Blue "after [she] won
5  [her] award" (e.g., sometime in approximately 2002). [Costa Decl., Exh. P; Opp. at 17:18.] As
6  such, any uses made of Blue's name after that date are knowing uses, in violation of the
7  California Right of Publicity statute. Thus, Blue is likely to succeed on the merits of her §3344
8  claim.

9  **E.   BLUE WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS NOT ISSUED.**
10

11        Woffinden's contention, once again provided without statutory or case support, that Blue
12  will not suffer irreparable harm if the infringing activity is allowed to continue simply misapplies
13  the rule. Specifically, as Blue and Woffinden agree, the required showing of irreparable harm
14  decreases as the probability of success on the merits increases. Opp. at 6:14-15. For the many
15  reasons detailed above, and largely unchallenged by Woffinden save for her self-serving
16  declaration and the bare arguments of her counsel, Blue is likely to succeed on the merits of her
17  claims. Accordingly, Blue must show only the lowest level of irreparable harm along the sliding
18  scale that all parties agree governs the matter. What is more, having proved a likelihood of
19  confusion sufficient to support a preliminary injunction, a trademark owner is *entitled* to a
20  presumption of irreparable harm, one that Woffinden has simply not rebutted. Anheuser-Busch,
21  Inc. v. Customer Co., Inc., 947 F.Supp. 422 (N.D. Cal., 1996) (Illston, J.); Sardi's, 755 F.2d at
22  724. *See also* our Motion at III. C. As such, and because Blue has proven a likelihood of success
23  on the merits of her claims, and for the many reasons detailed in Blue's PI motion, Blue has
24  ///
25  ///
26  ///
27  ///
28  ///

demonstrated the level of irreparable harm necessary for the issuance of a preliminary injunction in this case.[12]

### III. CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion for a preliminary injunction.

Dated: April 25, 2008

VOGELE & ASSOCIATES

By: /S/
Colette Vogele
Attorneys for Plaintiff VIOLET BLUE

---

[12] Finally, Woffinden attempts to tip the balance of hardship in her favor by suggesting that it would be difficult for her to change her infringing stage name. As Blue has previously recounted, see Motion at section III.D., this is simply not the case. Woffinden has repeatedly changed her name, and has done so during the pendency of this very litigation. Woffinden further argues that a name change would be impossible because the adult industry simply would not accept her under a new name. She argues, in fact, that she attempted to change her name to "Violetta Blue" but reverted back to "Violet Blue" when the name change "simply did not work." Opp. at 24:1. Unfortunately, counsel and client seem to diverge on that point. While the former argues the name change "simply did not work" the latter asserts that she reverted to the use of Blue's name "[u]pon the advise of counsel." Woffinden Decl., ¶ 23. If Woffinden's stage name is malleable enough to change under these circumstances, it is surely malleable enough to bend to the demands of equity and the Lanham Act. For this, and the many reasons recited by Blue in her Motion for Preliminary Injunction, the balance of hardships tip in favor of Blue in this case.